Loring R. HOOVER, Somers H. Smith, G. A. Buder, Jr., Frances Lamer, Clare F. Slutzkin, Howard V. Scotland, Howard V. Scotland, Trustee for Howard V. Scotland, Jr., U.D.T. January 1, 1955, M. Jack Breitbart and Mrs. Dorothy Bliss Breitbart, Plaintiffs,

v.

George E. ALLEN, Willard W. Keith, Hal A. Kroeger, Samuel H. Moerman, James H. Sharp, M. J. Frechie, H. J. Coyle, C. Russell Feldman, Daniel K. Ludwig, National Bulk Carriers, Inc., American Tankers Corp. of Delaware, William K. Warren, the William K. Warren Foundation and American-Hawaiian Steamship Company, Defendants.

United States District Court
S. D. New York.
April 22, 1965.

Motion for Reargument Denied
June 17, 1965.

Loring R. Hoover, New York City, for plaintiffs.

Hughes, Hubbard, Blair & Reed, New York City, for defendants Willard W. Keith, Samuel H. Moerman, James H. Sharp and Daniel K. Ludwig, Otis Pratt Pearsall and Amalya L. Kearse, New York City, of counsel.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for defendant American-Hawaiian Steamship Co., Jay H. Schafrann, New York City, of counsel.

Robert W. Ginnane, Gen. Counsel, Interstate Commerce Commission, Washington, D. C., Clarence William Vandegrift, Washington, D. C., of counsel, amicus curiae.

Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Assoc. Gen. Counsel, Securities and Exchange Commission, Washington, D. C., Meyer Eisenberg, Sp. Counsel and Allan S. Mostoff, Atty., Washington, D. C., amicus curiae.

HERLANDS, District Judge.

Defendants Keith, Moerman, Sharp, Ludwig and the American-Hawaiian Steamship Company (hereinafter sometimes referred to as the Company), a New Jersey corporation, have moved, pursuant to Rules 56 and 43(e) of the Federal Rules of Civil Procedure, for summary judgment.

This is an action brought by stockholders of the Company both derivatively, in the right of the Company, and representatively, in behalf of themselves and other stockholders similarly situated.

The voluminous Final Amended Supplemental Complaint (hereinafter referred to as the Complaint) was originally challenged by defendants in a motion to dismiss, under Rule 12(b) (1), (6) of the Federal Rules of Civil Procedure, for lack of jurisdiction over the subject matter and for failure to state a claim upon which relief can be granted.

In ruling on that motion, this court, in an unreported oral decision rendered on November 23, 1962 (hereinafter referred to as the Prior Decision), dismissed a number of claims contained in the Complaint, but upheld certain claims as pleaded in the first four causes of action based upon alleged violations of sections 14(a) and 18(a) of the Securities Exchange

Act of 1934, 48 Stat. 895, 897 (1934), 15 U.S.C. §§ 78n(a), 78r(a) (1958) (hereinafter the 1934 Act), and sections 7(a) (2), 7(a) (4), 20(a), 34(b), and 36 of the Investment Company Act of 1940, 54 Stat. 802, 822, 840, 841 (1940), 15 U.S.C. §§ 80a–7(a) (2), 80a–7(a) (4), 80a–20(a), 80a–33(b), 80a–35 (1958) (hereinafter the 1940 Act).

The relief sought in the first four causes of action is dissolution of the Company, partial liquidation of the Company, an accounting to the Company for assets utilized solely for the benefit of defendants, and an accounting to the Company for the losses sustained by the Company as a result of its failure to register with the Securities and Exchange Commission (SEC) as an investment company, as a result of its failure to liquidate in 1955, and as a result of defendants' waste of the Company's assets.

The present motion for summary judgment is addressed to all of the claims enumerated above except those based on section 36 of the 1940 Act.

Defendants make this motion on affidavits pursuant to Rule 56(e) of the Federal Rules of Civil Procedure on the ground that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.

It is plaintiffs' contention that, as to certain claims, there are genuine issues of fact which would prevent the court from granting defendants' motion. This contention will be considered, where relevant, in the discussion of each of plaintiffs' claims as to which defendants have moved for summary judgment.

Federal jurisdiction is based on 28 U.S.C. § 1331, as well as section 27 of the 1934 Act, 48 Stat. 902, (1934), 15 U.S.C. § 78aa (1958), and section 44 of the 1940 Act, 54 Stat. 844 (1940), 15 U.S.C. § 80a–43.

## I.

## CLAIMS BASED ON ALLEGED VIOLATIONS OF SECTION 18(a) OF THE 1934 ACT.

The Prior Decision held that the following allegations stated a claim under section 18(a) of the 1934 Act sufficient to withstand defendants' motion to dismiss under Rule 12(b) (1), (6):

1. March 25, 1955—Defendants caused the Company to issue an annual report to stockholders which omitted material facts relating to changes in the Company's board of directors and which contained misleading financial statements. Complaint, par. 42; Prior Decision, 18 (page citations to the Prior Decision are to the official reporter's transcript).

2. 1955–1958—Defendants caused the Company to fail to report to stockholders or to the Securities and Exchange Commission a contingent asset worth about $1,900,000. Complaint, par. 7(d); Prior Decision, 18.

3. 1954–1959—Defendants caused the Company to give false financial statements to its stockholders and the Government. Complaint, par. 8; Prior Decision, 18.

4. In or before 1955—Certain purchases of the Company's shares made by defendant Ludwig were not correctly reported to the Securities and Exchange Commission or the New York Stock Exchange in violation of section 16(a) of the 1934 Act and Rule 16a–1 issued thereunder. Complaint, par. 46(a); Prior Decision, 20–22.

The gravamen of the claims based on the alleged violations of section 18(a) are: (1) defendants schemed to gain control of the Company; that is, that by means of false and misleading statements, stockholders other than plaintiffs were induced [1] to sell their stock to the

---

1. Paragraph 5(iv) of the Complaint alleges that the price that the Company paid for the shares purchased by it exceeded the market price. Paragraph 6 (d) of the Complaint alleges that the effect of misleading statements to stock-

holders, the basis for the cause of action under section 18(a), was to "depress the price of said stock below its real value based on the net assets of the Company," i. e., liquidation value.

Company, thereby giving defendant Ludwig and his nominee directors, defendants herein, control of the Company; and (2) defendants then committed acts of waste. The alleged waste constitutes the actual damage claimed to have resulted from the alleged violations.

For purposes of this motion for summary judgment, defendants concede *arguendo* the truth of the above-alleged facts. Thus, as to claims based on section 18(a) of the 1934 Act there are no issues of fact remaining, and the motion must be considered on the merits.

Section 18(a) of the 1934 Act provides as follows:

"(a) Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78*o* of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance * * *."

There is no claim in this action, as there was in the recent cases of O'Neill v. Maytag, 230 F.Supp. 235 (S.D.N.Y.), aff'd, 339 F.2d 764 (2d Cir. 1964); Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964); and Kane v. Central American Mining & Oil, Inc., 235 F.Supp. 559, 564 (S.D.N.Y.1964), that the misleading statements caused the corporation to either purchase or sell stock at a price *unfavorable to the corporation.* Indeed, no such claim could be made in this case because, if the allegedly misleading statements had any operative effect at all, that effect, by virtue of the nature of the alleged misrepresentations, could have been only to *depress* the price at which the corporation bought its stock.

Defendants contend that section 18(a) creates a liability only in favor of someone who is able to satisfy all of the following four conditions: that person must have (1) "purchased or sold a security," (2) "in reliance upon such [false or misleading] statement," (3) "not knowing that such statement was false or misleading," (4) "at a price which was affected by such statement."

Further, defendants argue, a plaintiff satisfying these four conditions is explicitly limited to a suit "for damages caused by such reliance."

Applying the reasoning above to the facts of this case, defendants point out that plaintiffs—who have not alleged that they bought or sold securities of the Company *at all*, much less in reliance upon alleged false or misleading statements attributable to defendants—have failed to bring themselves within the restricted class of persons specified by section 18(a).

Finally, defendants point to the fact that the damages claimed in this suit—assertedly the result of acts of corporate waste—are not within the explicit ambit of the statute as to recoverable damages.

Defendants contend that a claim which patently cannot satisfy conditions appearing on the very face of the statute upon which it purportedly is based is either so frivolous as to deprive the court of jurisdiction over the subject

For purposes of this motion, the court will assume that the alleged misrepresentations had some operative effect. Attributing to the alleged misrepresentations the only effect that they could have, the court will assume that they caused or induced shareholders other than plaintiffs to sell their stock back to the Company at a price lower than they otherwise would have been willing to sell. Stated another way, since the price at which people buy and sell is the market price, the assumed effect of the misleading statements was to lower the market price of the Company's stock. That such an assumed effect is irreconcilable with the claim that the price at which the Company purchased its stock exceeded the market price, is a fact which the court, for present purposes, will ignore.

matter of this suit, or, at least, fails to set forth facts sufficient to support a claim upon which relief can be granted. Under either legal theory, defendants claim, they are entitled to summary judgment.

The legislative history of section 18(a) persuasively confirms defendants' view that the coverage of that section is no broader than that indicated by the plain meaning of its language. See 78 Cong. Rec. 7700–01, 8039, 8040 (1934) (remarks of Representative Rayburn and Representative Hollister); 78 Cong.Rec. 8199 (1934) (remarks of Senator Kean and Senator Norris); Hearings Before the Senate Committee on Banking and Currency, 73d Cong., 2d Sess. 6564–65 (1934) (remarks of Mr. Corcoran, Mr. Redmond and Senator Costigan) (consideration of original Senate Bill S. 2693 containing provisions deleted in final section 18(a)); S.Rep.No. 792, 73d Cong., 2d Sess. 12–13 (1934).

Defendants cite Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir. 1951) as supporting their interpretation of section 18(a). The salient feature of Fischman v. Raytheon emphasized by defendants is the fact that plaintiffs therein alleged in their complaint that they had purchased stock in reliance upon statements in a registration statement and prospectus which they had not known were misleading. The court of appeals held that these allegations, with certain amendments to the complaint not here relevant

(but discussed below), were sufficient to state a claim under section 18(a).

If this were all that could be extracted from Fischman v. Raytheon, its support of defendants' position would be open to question. There is more in that case, however, which, when placed in the context of other decisions, is dispositive of the issue as to whether a plaintiff relying on section 18(a) must have been either a purchaser or seller.

In Fischman v. Raytheon, both preferred and common stockholders of the Raytheon Corporation sued for damages on the basis of false and misleading statements contained in a registration statement and a prospectus for the sale of *preferred* shares. Suit was based, so far as relevant, on section 11(a) of the Securities Act of 1933 [2] and sections 10 (b) [3] and 18(a) of the 1934 Act. One of the issues was whether the *common* stockholders, who concededly could not maintain an action under section 11(a) of the 1933 Act, could maintain an action under sections 10(b) and 18(a) of the 1934 Act. The court, in discussing the relationships of these sections, stated at 786–787, 788:

"A suit under § 11 of the 1933 Act requires no proof of fraud or deceit, and such a suit may be maintained only by one who comes within a narrow class of persons *i. e. those who purchase securities that are the direct subject of the prospectus and*

2. 48 Stat. 82 (1933), as amended, 15 U.S.C. § 77k (1958):
"(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [certain specified persons] * * *."

3. 48 Stat. 891 (1934), 15 U.S.C. § 78j (1958):
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange—
\* \* \* \* \*
"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe \* \* \*."

*registration statement* (here the purchasers of preferred stock). But proof of fraud is required in suits under § 10(b) of the 1934 Act * * *. Congress reasonably, and without inconsistency, allowed suits of that sort which (1) are free of the restrictions applicable to a suit under § 11 of the 1933 Act and (2) which are not confined to those persons who may properly sue under that section but which include all who are the victims of the fraud. We think that when, to conduct actionable under § 11 of the 1933 Act, there is added the ingredient of fraud, then that conduct becomes actionable under § 10(b) of the 1934 Act * * *, at the suit of any defrauded person, whether or not he could maintain a suit under § 11 of the 1933 Act.

\* \* \* \* \* \*

"We construe Section 18(a) of the 1934 Act as applicable to a document filed with a national securities exchange. If the registration statement or prospectus or other document was thus filed, something more occurred than the conduct covered by § 11 of the 1933 Act. Nothing in that section is therefore inconsistent with a remedy under § 18(a) of the 1934 Act. Accordingly, the common stockholders may also maintain their action under that section if * * * they amend to allege a filing with a national securities exchange." [Emphasis added.]

In Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), shareholders of the Newport Steel Corporation sued under § 10(b) of the 1934 Act and Rule X–10B–5 [4] of the Securities and Exchange Commission issued thereunder. As a basis for their claim, the shareholders alleged that misrepresentations and other specific acts of fraud were perpetrated upon them as part of a scheme by which a controlling shareholder of Newport was enabled to sell his controlling interest in the corporation to another corporation, at a premium, in violation of his fiduciary obligation.

In affirming the lower court's dismissal of the complaint for failure to state a claim, the court, at 464, said:

"When Congress intended to protect the stockholders of a corporation against a breach of fiduciary duty by corporate insiders, it left no doubt as to its meaning. Thus Section 16(b) of the Act of 1934, 15 U.S.C.A. § 78p (b), expressly gave the corporate issuer or its stockholders a right of action against corporate insiders using their position to profit in the sale or exchange of corporate securities. The absence of a similar provision in Section 10(b) strengthens the conclusion that that section was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs, and that *Rule X– 10B–5 extended protection only to the defrauded purchaser or seller.* Since the complaint failed to allege that any of the plaintiffs fell within either class, the judgment of the district court was correct and is ac-

4. 17 C.F.R. § 240.10b–5 (1949). *Employment of manipulative and deceptive devices by any purchaser of a security*
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made * * * not misleading, or
"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

cordingly affirmed." [Emphasis added.]

Accord, e. g., Hooper v. Mountain States Sec. Corp., 282 F.2d 195, 201 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S. Ct. 695, 5 L.Ed.2d 693 (1961); O'Neill v. Maytag, 230 F.Supp. 235, 239 (S.D. N.Y.), aff'd, 339 F.2d 764 (2d Cir. 1964); Cooper v. North Jersey Trust Co., 226 F.Supp. 972, 978 (S.D.N.Y.1964); New Park Mining Co. v. Cranmer, 225 F. Supp. 261, 266 (S.D.N.Y.1963); cf. Keers & Co. v. American Steel & Pump Corp., 234 F.Supp. 201, 203 (S.D.N.Y. 1964).[5]

■ The foregoing decisions illustrate (1) that the words "any person acquiring such security" in section 11(a) of the 1933 Act have been held to restrict suit under that section to actual purchasers of the securities, Fischman v. Raytheon Mfg. Co., supra; and (2) that the words "in connection with the purchase or sale" in section 10(b) of the 1934 Act have been held to restrict suit under that section to purchasers or sellers. Birnbaum v. Newport Steel Corp., supra.

■ The above interpretations do not, of course, logically compel a similarly restrictive interpretation of the language in section 18(a) of the 1934 Act ("shall have purchased or sold"). But, the overall unitary scheme of regulation and the above-noted interrelationship of the three sections,—§ 11(a) of the 1933 Act and §§ 10(b) and 18(a) of the 1934 Act—persuade this court to hold that a prerequisite of a claim under section 18 (a) of the 1934 Act is the fact that the plaintiff shall have purchased or sold securities and the injury for which damages are sought shall have been the direct result of such purchase or sale. See 3 Loss, Securities Regulation, 1751–54 (2d ed. 1961); 59 Yale L.J. 1120, 1128 (1950).

Plaintiffs attempt to satisfy this requirement by the following sequence of propositions: that this is a derivative action on behalf of the Company; that

false statements which the defendants caused the Company to make induced stockholders other than plaintiffs to sell their stock back to the Company; that this eventually caused the injuries for which plaintiffs seek recovery; that the misleading statements brought about the Company's purchasing securities, whereby it was injured; and, therefore, that the Complaint states a derivative cause of action on behalf of the Company under section 18(a).

Plaintiffs' argument is unsound for reasons now to be detailed.

■ First, the reliance requirement in the statute itself has made explicit the type of causal relationship necessary to maintain an action under section 18(a). In the present case, the misleading statements did not cause a purchase by stockholders; they caused a sale by stockholders. The statements did not cause the stockholders to make an offer, but to accept one. Cf. List v. Fashion Park, Inc., 340 F.2d 457, 462–463 (2d Cir. 1965). Thus, the only injury for which recovery might have been sought under this section would be that suffered by those stockholders who sold their stock in reliance upon the misleading statements. The legislative history already cited leaves no doubt as to this conclusion. For that reason, the recent case of Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964) is inapposite to this claim brought under section 18(a).

The Ruckle case was a derivative action brought on behalf of the defendant Roto American Corporation by a shareholder who alleged that he represented more than 50 percent of the stock entitled to vote at the 1964 annual meeting of Roto American shareholders. In addition to Roto American, the defendants were six of its directors, who were also its president, four vice-presidents and treasurer.

The gist of the complaint was that the defendant directors sought to perpetuate their control of Roto American, first, by postponing the annual stockholders' meet-

5. See text accompanying note 9, infra.

ing; and, second, by having the board of directors approve the issuance of additional Roto American treasury shares which were to be purchased or controlled by defendant Walton, Roto American's president.

The complaint alleged that approval for the issuance of the treasury shares was effected by means of the defendants' having fraudulently withheld from the board the latest financial statements, arbitrarily ascribing a value of $3.00 per share to Roto American stock, and approving several transactions involving the stock without disclosing the pertinent facts of these transactions to the entire board. The prayer was for injunctive relief.

The sole basis for the federal jurisdiction to grant injunctive relief to prevent the consummation of these transactions and the issuance of the treasury shares was alleged to be section 10(b) of the 1934 Act and Rule 10B–5 issued thereunder. See notes 2 and 3 supra.

The district court dismissed the claim for lack of subject matter jurisdiction, substantially relying on Birnbaum v. Newport Steel Corp., supra. The Court of Appeals for the Second Circuit reversed on the grounds that a cause of action under section 10(b) had been stated and that, therefore, there was federal jurisdiction.

The court of appeals first ruled that "the issuance by a corporation of its own shares is a 'sale' to which the anti-fraud policy expressed in the federal securities laws extends," and then distinguished Birnbaum, supra, and Howard v. Furst, 238 F.2d 790 (2d Cir. 1956), cert. denied, 353 U.S. 937, 77 S.Ct. 814, 1 L.Ed.2d 759 (1957) on their facts. In referring to Birnbaum, the court said (339 F.2d at 28):

"Birnbaum was a derivative suit on behalf of one corporation against a person who controlled that corporation until he sold his shares to another corporation which had not been deceived. The court limited the broad language of Rule 10B–5

to situations in which either the purchaser or the seller of the stock is defrauded, situations not presented by the facts of Birnbaum."

Later, in discussing both Birnbaum and Howard, the court stated (at 28):

"But neither Birnbaum nor Howard presented a situation in which suit was instituted on behalf of a defrauded corporation. It is perfectly obvious that in both cases the *fraudulent statements and omissions were directed at shareholders and not at the corporations.* In the circumstances of those cases, it therefore seems appropriate to hold that, absent statutory language to the contrary, a *corporation that has not been the victim of fraud cannot sue.*

"There is, however, no support in either of those opinions for the proposition that *when a corporation is actually defrauded* into issuing securities * * * it still cannot sue under Section 10(b) or Rule 10B–5." [Emphasis added.]

Next, the court considered the issue of whether it is possible, within the meaning of section 10(b) and Rule 10B–5 for a corporation to be defrauded by a majority of its directors, and concluded as follows (at 29):

"If, in this case, the board defrauded the corporation into issuing shares either to its members or others, we can think of no reason to say that redress under Rule 10B–5 is precluded, though it would have been available had anyone else committed the fraud."

Although it is not explicitly stated in the Ruckle case, the plain implication is that the $3.00 value arbitrarily ascribed to the Roto American stock by the defendant directors was less than it otherwise would have been had there been full disclosure of all pertinent facts. Fleischer, "Federal Corporation Law": An Assessment, 78 Harv.L.Rev. 1146, 1163 (1965).

If the misrepresentations in the Ruckle case had appeared in documents meeting

the filing requirements of section 18(a) of the 1934 Act and had the newly issued stock been sold at the fraudulently depressed price, this court has no doubt that the combined effect of Ruckle and Fischman v. Raytheon, supra, would give the injured corporation a cause of action for damages under section 18(a) as well as under section 10(b). In such a case, the corporation would have sold at the low price in reliance upon the misrepresentations, thus meeting the statutory requirement of section 18(a).

■ The crucial distinction, for purposes of section 18(a), between the case hypothesized above, predicated on the facts of the Ruckle case, and the present case is that, in the present case, the corporation *purchased* at the depressed (lowered) price; it did not *sell* at the depressed price. Thus, the *corporation* is not one "who, in *reliance* upon [false or misleading] * * * statement[s] * * * purchased or sold a security" (emphasis added), even though the price at which the corporation purchased "was affected by such statement[s] * * *."

The specific statutory language of section 18(a) not having been satisfied, the Complaint fails to state a claim under that section upon which federal relief can be granted.

The second reason why the Complaint herein fails to state a derivative action on behalf of the Company under section 18(a) is that—assuming that somehow the alleged misrepresentations caused rather than enabled the Company to purchase its stock—the injury complained of must be the direct result of the purchase or sale.

In this case, damages are sought for injuries said to result from acts of waste. The acts of waste, plaintiffs claim, were made possible only because defendants were able to gain control of the Company by violating section 18(a).

■ This chain of causation between violation of the statute and eventual injury to the Company is too remote to satisfy the demands of the statute. The fact that the damages under section 18 (a) are limited to those "caused by * * * reliance" upon the misleading statements completely negates plaintiffs' argument that more remote damages resulting from corporate waste will support a claim under section 18(a) of the 1934 Act. See 3 Loss, op. cit. supra, at 1752.

The court holds, therefore, that plaintiffs have failed to state a claim under section 18(a) upon which relief can be granted. Thus, defendants are entitled to summary judgment as to all claims based on that section.

There is another question, however, as to whether the claims based on section 18(a), which cannot even satisfy the requirements appearing on the very face of the statute, are so frivolous, within the meaning of Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939, 13 A.L.R. 2d 383 (1946), as to deprive this court of jurisdiction over the subject matter of the suit.

■ Jurisdiction over the claims based on section 18(a) rests on § 27 of the 1934 Act and on 28 U.S.C.A. § 1331. Without intending to minimize the significance of the jurisdictional issue in relation to the claims under section 18(a), the court will, at this point simply state its conclusion, deferring discussion of the issue until consideration of the claims based on sections 7(a) (2) and 7(a) (4) of the 1940 Act. That conclusion is that this court does have jurisdiction over the claims based on section 18(a) and this court dismisses those claims, on the merits, for failure to state a claim upon which relief can be granted.

The result thus reached makes it unnecessary to determine definitively defendants' claim that the statute of limitations contained in section 18(c) [6] of

---

6. "(c) No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts consti-

tuting the cause of action and within three years *after such cause of action accrued.*" [Emphasis added.]

the 1934 Act, applicable to claims under section 18(a), has run on all claims based on that section. Some discussion of the statute of limitations is warranted, however, for it tends to confirm the correctness of the court's conclusion that damages resulting from corporate waste do not come within the coverage of section 18(a).

The decisive question under the statute of limitations is: when did the cause of action under section 18(a) accrue? The statute would have begun to run from that time.

A cause of action does not accrue until some injury has been inflicted, and there can be no injury until there is damage. E. g., Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190, 195 (9th Cir. 1956); Rutkin v. Reinfeld, 229 F.2d 248, 252 (2d Cir.), cert. denied, 352 U.S. 844, 77 S.Ct. 50, 1 L.Ed.2d 60 (1956); Foster & Kleiser Co. v. Special Site Sign Co., 85 F.2d 742, 750-751 (9th Cir. 1936), cert. denied, 299 U.S. 613, 57 S.Ct. 315, 81 L.Ed. 452 (1937); Bluefields S. S. Co. v. United Fruit Co., 243 Fed. 1, 20 (3d Cir. 1917), appeal dismissed, 248 U. S. 595, 39 S.Ct. 136, 63 L.Ed. 438 (1919); Park-In Theatres v. Paramount-Richards Theatres, 90 F.Supp. 727, 729 (D.Del.), aff'd, 185 F.2d 407 (3d Cir., 1950), cert. denied, 341 U.S. 950, 71 S.Ct. 1017, 95 L.Ed.2d 1373 (1951).

Consequently, were the court to uphold the claim under section 18(a), the cause of action would not accrue until the damage occurred from the acts of corporate waste. Such damage bears no relationship to the "facts constituting the cause of action" within the meaning of section 18(c) of the 1934 Act; and, furthermore, to allow the damage resulting from waste to determine the beginning of the running of the statute of limitations would defeat the policy underlying the inclusion of a short statute of limitations in section 18.

The conclusion to grant summary judgment as to claims based on section 18(a) was intimated in this court's Prior Decision when it was said (at 21):

> "It is an issue whether the allegation of a violation of Section 18(a) is frivolous, since it is extremely doubtful that the plaintiffs, who are not alleged to have sold any stock, can ultimately recover under Section 18(a) of the Securities Exchange Act."

See also id. at 19.

Although, at that time, the court denied defendants' motion to dismiss under Rule 12(b) (1), (6), the court did point out "that the plaintiffs should have their day in court is one of the factors persuasive of the denial of defendants' motions. * * * The debatable questions of law posed by the pleaded facts will lend themselves to a less doctrinaire solution in the light of such facts as may or may not be established upon a plenary hearing." Prior Decision, at 39-40.

Dressler v. MV Sandpiper, 331 F.2d 130 (2d Cir. 1964) requires this court to give closer scrutiny to plaintiffs' case on a motion for summary judgment on affidavits under Rule 56(e) than it might otherwise be called upon to do on a motion on the pleadings under Rule 12. What appeared to be rather questionable in terms of legal sufficiency when only the allegations of the Complaint were before the court are now clearly untenable on the basis of the record presented on this motion for summary judgment.

## II.

### SECTION 10(b) OF THE 1934 ACT.[7]

The more difficult issue presented by the Ruckle case, supra, is whether the Complaint in the present case states a claim under section 10(b) of the 1934 Act and Rule 10B-5 issued thereunder See notes 3 and 4, supra.

7. Although section 10(b) of the 1934 Act was not relied upon by plaintiffs as a basis for imposing liability upon defendants, the foregoing discussion of the Ruckle case makes it obvious that section 10(b) is highly relevant to the facts of the case at bar. The court therefore, regardless of the failure of the parties to supply the statutory label, must determine whether plaintiffs have stated a claim under section 10(b) of the 1934 Act.

For the same reasons that required dismissal of the claim brought under section 18(a), the court grants summary judgment dismissing any derivative claim under section 10(b) predicated solely upon the Company's alleged purchase of stock from shareholders other than plaintiffs.

As stated in the Fischman case, supra, an action under section 10(b) requires an allegation of fraud. Accord, O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964), affirming 230 F.Supp. 235 (S.D. N.Y.). For purposes of this motion, it will be assumed that the price at which the Company purchased its stock was artificially depressed below actual value as the result of misleading statements knowingly made pursuant to a scheme on the part of the defendants to place control of the Company in the hands of defendant Ludwig. Such would satisfy the *fraud* requirement of section 10(b).

Because, however, the Company *purchased*, rather than sold, at the fraudulently depressed price, the sellers and not the Company were the "victims" of the alleged fraud. List v. Fashion Park, Inc., 340 F.2d at 462–463. Indeed, the immediate effect of the Company's purchasing at a price below value was to benefit, rather than injure, the Company.

Consequently, the Company has no cause of action under section 10(b) predicated solely upon its purchase of its stock at a fraudulently lowered price. It follows that a derivative action under section 10(b) premised on this theory cannot stand.

There remain, however, the following two issues suggested by the Ruckle case:

1. Is acquisition of corporate control, effected by means of purchases made possible by misleading statements knowingly made, an injury to the Company for which a derivative action will lie under section 10(b)?

2. If so, are damages resulting from acts of waste, committed by those in control as a result of the fraud, damages for which recovery may be sought under section 10(b)?

A restatement of the first issue is whether the Ruckle case would have been decided the same way if, pursuant to the scheme to perpetuate the corporate control of Roto American by defendants in that case, Roto American—instead of selling its treasury stock to defendants at a fraudulently depressed price—had, at that same price, purchased some of its outstanding stock from shareholders other than defendants, thereby increasing the defendants' proportionate ownership and control. The case just hypothesized is, of course, the present case, except as to the relief sought.

Only in its concluding paragraph does the opinion in Ruckle possibly shed some light on this problem:

> "In this case, it may be that the stock was not intended ultimately to find its way into the hands of the defendant directors or their associates. It may be that there was no concealment of material facts at the board of directors meeting at which the transactions were approved. But, these are matters which, of course, go to the merits of the case and not to the jurisdiction of the court."

It may arguably be inferred from the statement just quoted that evidence concerning the ultimate destination of the sold treasury stock may possibly be relevant in view of the proposition that fraudulent acquisition of control constituted an injury to the corporation under section 10(b).

It may also arguably be inferred from the above-quoted statement, however, that evidence concerning the ultimate destination of the stock would be relevant to prove or disprove the existence of fraud in connection with the issuance of the treasury stock at a price below value. Evidence concerning motive would be significantly probative on the fraud question.

O'Neill v. Maytag, 230 F.Supp. 235 (S.D.N.Y.), aff'd, 339 F.2d 764 (2d Cir. 1964) may also shed some light on the issue under discussion. The facts of O'Neill, so far as now pertinent, involved defendants who had caused the corpora-

tion to purchase its own stock at a price *higher* than the market value, as part of a scheme to entrench and perpetuate defendants' control of the corporation.

A derivative action under section 10(b) was dismissed by the district court for lack of jurisdiction [8] on the ground that the complaint did not allege facts constituting fraud.

The implication, however, was that had fraud been adequately pleaded, a cause of action under section 10(b) would have been stated.

The scheme to perpetuate control of the corporation by defendants was discussed at length by the court with reference to Section 409(b) of the Federal Aviation Act, 49 U.S.C. § 1379(b) (1958), 72 Stat. 769 (1958). Yet that scheme was at no time mentioned as inflicting an injury to the corporation under section 10(b) of the 1934 Act. In discussing possible injury to the corporation under the latter section, the court said at 239 of 230 F.Supp.: "In substance, the claim is that defendants caused * * * [the corporation] to pay too much for the stock."

A possible inference to be drawn from the failure of the court in O'Neill to mention, with reference to section 10(b), the scheme to perpetuate corporate control is that fraudulent acquisition of control would not constitute an injury to the corporation under that section.

There is no allegation in the Complaint in the case at bar that there was a conspiracy to loot the Company or to waste its assets. See 3 Loss, op. cit. supra at 1469. The only element of injury claimed to have been caused the corporation by the fraud was the acquisition of corporate control by defendant Ludwig.

■ Without relying on possible inferences drawn from Ruckle and O'Neill (in which cases injury to the respective corporations under section 10(b) or the threat thereof was present independent of the fraudulent acquisition of control), this court concludes that control acquired as part of a fraudulent scheme, of itself, is not an injury to the corporation within the meaning of section 10(b) of the 1934 Act upon which a derivative action can be based.

■ The injury, if any, from such a scheme would be to the remaining minority shareholders whose power has been diluted through the Company's purchases,—an injury for which these shareholders, under the rule of Birnbaum, supra, and other cases,[9] have no remedy because they are neither purchasers nor sellers.

That no derivative action should lie in this case is also strongly suggested by the logical consideration that an anomalous situation would be created, were the court to allow it.

For example: should defendants in this case have caused the Company to do exactly as it did do in regard to false and misleading statements, thus depressing the price of the stock; and should the defendant Ludwig rather than the Company itself have purchased the stock at this lowered price and thereby have gained corporate control,—no derivative action would lie under Birnbaum, supra, regardless of whether the corporation had been injured.

Yet, for the very same injury (should injury to the corporation be found), according to plaintiffs' contentions herein a derivative action would lie by force of the variant fact that defendants utilized the Company as an instrument of their alleged scheme to put Ludwig in corporate control.

The court recognizes that, after the decision in Birnbaum, only if a derivative action would lie could a federal remedy be available as a sanction against acquisition of corporate control effectuated by fraudulently tainted purchases of stock.

If, however, a federal remedy is deemed desirable as a matter of policy, *but see*

---

8. In affirming, the court of appeals stated that dismissal should more properly have been on the merits. See discussion, infra.

9. See text accompanying note 5, supra.

O'Neill v. Maytag, 339 F.2d 764, 768 (2d Cir. 1964), affirming 230 F.Supp. 235 (S.D.N.Y.), it should not be created through the device of a fiction—the "finding" of a corporate injury when none exists. If a remedy in a federal court should exist, it should exist for those actually injured—the minority shareholders. Such relief will not be judicially available until the words "in connection with the purchase or sale" of section 10 (b) are interpreted less restrictively than in Birnbaum and in the many cases following Birnbaum.

Equally manifest is the fact that, even were this district court to view Birnbaum as too narrow, it must follow it.

Moreover, even if fraudulent acquisition of corporate control were found to constitute an injury to the Company under section 10(b), damages resulting from acts of corporate waste committed by those who acquired corporate control by means of the fraud would not constitute damages for which federal relief may be sought under section 10(b).

There is nothing inherent in the mere acquisition of corporate control that would make acts of waste a necessary or probable result thereof. While it is logically true that "but for" corporate control the alleged acts of corporate waste could not have been committed, the "but for" test of causation has been fully discredited as a basis for imposing liability, particularly when, as here, such a test would also be the sole justification for federal intervention in a cause of action otherwise squarely posited on violations of state law. In sum, fraudulent acquisition of corporate control is not the proximate cause of acts of corporate waste.

J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) is entirely consistent with the result here reached. In J. I. Case the issue before the Court was, at 428, 84 S.Ct. at 1558,

"whether § 27 of the [1934] Act authorizes a federal cause of action for rescission or damages to a corporate stockholder with respect to a consummated merger which was authorized pursuant to the use of a proxy statement alleged to contain false and misleading statements violative of § 14(a) of the [1934] Act."

The Court held in the affirmative. In the course of the opinion, the allegations of plaintiffs were set out, at 429–430, 84 S.Ct. at 1558–1559, as follows:

"that petitioners * * * solicited * * * proxies of Case stockholders for use at a special stockholders' meeting at which the proposed merger with ATC was to be voted upon; that the proxy solicitation material so circulated was false and misleading in violation of § 14(a) of the Act and Rule 14a–9 which the Commission had promulgated thereunder; that the merger was approved at the meeting by a small margin of votes and was thereafter consummated; that the merger would not have been approved but for the false and misleading statements in the proxy solicitation material; and that Case stockholders were damaged thereby."

In J. I. Case, the merger was not only the reasonably foreseeable result of the proxy solicitation; it was the very objective of the proxy solicitation. In that case, the causal relationship between the statutory violation and the merger was intimate and direct.

### III.

### CLAIMS BASED ON ALLEGED VIOLATION OF SECTION 14(a) OF THE 1934 ACT.

Paragraph 48(b) of the Complaint alleges that the Company's proxy statement of April 15, 1955 contained false and misleading statements. This was held sufficient [10] in this court's Prior Decision,

---

10. Serious misgivings prompted this court to state in the Prior Decision, at 23:
"If paragraph 48(b) is not so indefinite as to be frivolous [because it does not specify in what respect the proxy statement was false and misleading], it should be taken as asserting a violation of Section 14 of the Securities Exchange Act."

at 22–24, to allege a violation of section 14(a) of the 1934 Act [11] and Rule 14a–9 [12] promulgated by the Commission thereunder.

■ It is not clear from the Complaint what damages are claimed to have resulted from the alleged violation of section 14(a). Having given this matter comprehensive consideration, the court agrees with defendants that "the gravamen of plaintiffs' claim under section 14(a) is that allegedly false and misleading statements in American-Hawaiian's 1955 proxy statement caused stockholders of American-Hawaiian to sell their stock to defendant Ludwig or to American-Hawaiian, thus giving defendants control of American-Hawaiian, and enabling defendants to commit acts of waste." See Complaint, paragraphs 48(b), 49(a), 49(b).

Thus stated, the Complaint fails to state a cause of action under section 14(a) upon which relief can be granted.

There is no claim in this case (as there was in J. I. Case, supra) that any corporate action was taken pursuant to the proxies thus solicited. The only claimed injury is said to have resulted from the circumstance that statements in the proxies caused stockholders other than plaintiffs to sell stock. The fact that the piece of paper upon which the allegedly misleading statements appeared was a proxy statement is irrelevant to the damage claimed.

As stated in J. I. Case, at 431, 84 S.Ct. at 1559:

"The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that '[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.' H.R.Rep.No.1383, 73d Cong., 2d Sess., 13. It was intended to 'control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which * * * [had] frustrated the free exercise of the voting rights of stockholders.' Id., at 14. 'Too often proxies are solicited without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.' S.Rep.No.792, 73d Cong., 2d Sess., 12."

■ In the absence of some allegation of infringement upon corporate suffrage rights or some corporate action taken as a result of such infringement, no cause of action under section 14(a) has been made out.

Nor could the allegation that false statements appeared in proxy solicitation material be read as stating a cause of action under either section 18(a) or section 10(b) of the 1934 Act, for the reasons discussed above with reference to those sections.

11. 48 Stat. 895 (1934), 15 U.S.C. § 78n (1958):

"(a) It shall be unlawful for any person * * * to solicit or to permit the use of his name to solicit any proxy * * * in respect of any security * * * registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

12. 17 C.F.R. § 240.14a–9 (1949). *False or misleading statements.*

"No solicitation * * * [subject to this regulation] shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading * * *."

For the text of Rule 14a–9 and a full discussion thereof, see 2 Loss, op. cit. supra at 916–24.

## IV.

## CLAIM BASED ON ALLEGED VIOLATION OF SECTION 20(a) OF THE 1940 ACT.

Plaintiffs allege, in paragraph 121 of the Complaint, that defendants caused a letter and proxy statement (dated May 16, 1959 and sent by the Company for the special stockholders' meeting in June, 1959) to give false reasons in favor of an amendment to the Company's charter.

Paragraph 122 of the Complaint alleges that, as a result, the amendment to the charter—authorizing the Company to conduct business as an investment company—was illegal and void.

These allegations were held, in the court's Prior Decision, 22–23, to have stated a cause of action under section 20(a) of the 1940 Act.[13] The rules which have been prescribed by the Commission pursuant to section 20(a) of the 1940 Act adopt by reference the rules prescribed pursuant to section 14(a) of the 1934 Act. See note 8, supra.

In an affidavit by defendant Coyle filed June 2, 1964, it is alleged—without contradiction by opposing affidavits—that by the end of April, 1959, defendant Ludwig's ownership of outstanding stock of the Company was approximately 77 percent.

By stipulation (dated June 24, 1964) the parties have agreed that the meeting of the Company's stockholders called to consider the charter amendment referred to in paragraphs 121 and 122 of the Complaint was held on May 26, 1959, and that on that date the applicable New Jersey law was section 14:11–2 of the New Jersey General Corporation Law, which provided that a charter may be amended if two-thirds in interest of each class of stockholders having voting powers shall vote in favor of such amendment.

In light of the foregoing, defendants advance this argument: since, at the time of the May, 1959 proxy solicitation, defendant Ludwig already held more than the requisite number of shares to effect the charter amendment, the alleged violation of section 20(a) of the 1940 Act could not, as a matter of law, have caused the damage claimed.

Although facts meeting the "but for" test will not necessarily establish proximate cause, the failure to satisfy that test necessarily negates the possibility of proximate cause. Satisfaction of the "but for" test is a minimum requirement of proximate causation.

It will be recalled that the complaint in J. I. Case, supra, at 430, 84 S.Ct. at 1558 alleged

"that the merger was approved at the meeting by a small margin of votes and was thereafter consummated; that the merger would not have been approved *but for* the false and misleading statements in the proxy solicitation material * * *." [Emphasis added.]

Since the charter amendment herein could have been accomplished by defendants regardless of the May, 1959 proxy solicitation, plaintiffs have failed to satisfy the minimum requirement of causation; and their cause of action under section 20(a) of the 1940 Act cannot stand. Accord, Barnett v. Anaconda Co., 238 F.Supp. 766 (S.D.N.Y.1965).

Nor is the result here reached, dismissing the claim under § 20(a) of the 1940 Act, inconsistent with Ruckle, supra.

It will be recalled that in Ruckle a majority of the board of directors withheld information from the remainder of the board and that thereafter the board approved certain transactions, among which was the issuance of additional treasury

13. 54 Stat. 822 (1940), 15 U.S.C. § 80a–20 (1958):

"(a) It shall be unlawful for any person, by use of the mails or * * * otherwise, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security of which a registered investment company is the issuer in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

stock at an allegedly arbitrarily low price.

Although under applicable state law a majority of the board of directors in Ruckle may have had the power to approve the transactions under attack, regardless of disclosure or non-disclosure, the court in Ruckle did not discuss the issue of causation between the alleged statutory violation and the damage claimed to have resulted therefrom.

The result reached in Ruckle, however, can be explained on the grounds that had disclosure been made and it was revealed that the value of the stock was higher than the price arbitrarily ascribed to it, the imminence of relief based upon obvious transgressions of state law would have effectively prevented the board of directors from carrying out their alleged scheme. See Fleischer, supra, 78 Harv. L.Rev. at 1164.

In the case at bar, however, there is nothing at all illegal about amending a corporate charter, in and of itself. Thus, regardless of the alleged false reasons given in favor of the proposed amendment, Ludwig, owning 77 percent of the outstanding stock, could have effected the amendment; that is, even had the true reasons been disclosed, nothing would have prevented Ludwig from doing just as he did.

## V.

### CLAIM BASED ON ALLEGED VIOLATION OF SECTION 34(b) OF THE 1940 ACT.

Paragraph 117 of the Complaint alleges that the registration statement filed by the Company on May 21, 1959 contained false and misleading statements. This allegation was held in the court's Prior Decision at 27–28, to have stated a violation of section 34(b) of the 1940 Act.[14]

This court (in the Prior Decision, at 28) found the damage alleged to have resulted from the violation of section 34(b) of the 1940 Act to be stated in paragraph 51 of the Complaint, as follows:

"51. By reason of the wrongful acts of the defendant directors * * * of the Company and defendant * * * Ludwig, the minority shareholders, subsequent to February 9, 1955, were frozen out and in effect disfranchised. They have been unable to exercise any voice in the conduct of the affairs of the Company, elect any director or defeat the proposed amendment to the Company's charter to authorize it to operate and register as an investment Company [instead of a shipping company]."

By stipulation dated June 24, 1964, the parties agreed to the following:

"3. None of the plaintiffs herein sold American-Hawaiian stock by reason of statements contained in American-Hawaiian's registration statement dated May 21, 1959. None of the plaintiffs herein lost his right to vote his American-Hawaiian stock, or ceased to receive notices of American-Hawaiian stockholders' meetings by reason of statements contained in American-Hawaiian's registration statement dated May 21, 1959."

Thus, interpreting the Complaint as favorably as possible, the most that plaintiffs could claim is that sales made by shareholders other than plaintiffs, in reliance upon misleading statements in the May 21, 1959 registration statement, caused damage to plaintiffs in that the effect of these sales was to place Ludwig

---

14. 54 Stat. 840 (1940), 15 U.S.C. § 80a–33 (1958):

"(b) It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement * * * or other document filed or transmitted pursuant to this subchapter or the keeping of which is required pursuant to section 80a–30(a) of this title. It shall be unlawful for any person so filing * * * any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading."

in control of the Company and thus deprive the now minority shareholders of whatever power they formerly held.

There can be no doubt that the claim, as pleaded in paragraph 51 of the Complaint, is one in favor of the minority shareholders and *not* the corporation. Thus, there is no question here, as there was in relation to section 10(b) of the 1934 Act, as to whether a *derivative* action would lie under section 34(b) of the 1940 Act for an injury such as the one claimed.

Since the claim now under discussion is a representative action, the issue posed is whether such an action can be brought under section 34(b) of the 1940 Act by persons who neither purchased nor sold nor otherwise acted in reliance upon the misleading statements which constitute the section 34(b) violation.

■ However, this issue need not be reached for the following specific reason: assuming *arguendo* that plaintiffs may sue under section 34(b), it is apparent that by May 21, 1959 the misleading statements could not have caused the damage alleged. As of that date, defendant Ludwig already owned approximately 77 percent of the Company's shares then outstanding. Consequently, the misleading statements in the May 21, 1959 registration statement could not have had the effect claimed—that is, to place Ludwig in control of the Company. For this specific reason, the cause of action brought under section 34(b) of the 1940 Act must be dismissed.

### VI.

CLAIMS BASED ON ALLEGED VIOLATIONS OF SECTIONS 7(a) (2) AND 7(a) (4) OF THE 1940 ACT.

Plaintiffs' claims under sections 7(a) (2) and 7(a) (4) of the 1940 Act are premised on the fact that the Company— allegedly an investment company within the meaning of section 3(a) of the 1940 Act, 54 Stat. 797 (1940), 15 U.S.C. §

80a–3 (1958)—did not register with the Securities and Exchange Commission as an investment company pursuant to section 8 of the 1940 Act, 54 Stat. 803 (1940), 15 U.S.C. § 80a–8 (1958), until February, 1959.

Plaintiffs claim that, during the period in which the Company was not registered as an investment company, it violated sections 7(a) (2) and 7(a) (4) of the 1940 Act by purchasing its own stock from shareholders other than plaintiffs and by engaging in various acts of interstate commerce.

Section 7 of the 1940 Act, 54 Stat. 802 (1940), 15 U.S.C. § 80a–7 (1958) relevantly provides as follows:

"(a) No investment company organized or otherwise created under the laws of the United States or of a State and having a board of directors, unless registered under section 80a–8 of this title, shall directly or indirectly—

\* \* \* \* \* \*

"(2) purchase, redeem, retire, or otherwise acquire or attempt to acquire, by use of the mails or any means or instrumentality of interstate commerce, any security or any interest in a security, whether the issuer of such security is such investment company or another person;

\* \* \* \* \* \*

"(4) engage in any business in interstate commerce \* \* \*.

The damages alleged to have resulted from the claimed violations of sections 7(a) (2) and 7(a) (4) are as follows:

1. As to section 7(a) (2): the Company's purchases of its stock in 1955, 1957 and 1958 were for no bona fide business purpose; were a diversion of corporate funds and, therefore, constituted acts of waste; the amounts paid for such purchases were more than the market price [15] and, therefore, wasteful; and

---

15. Again, see note 1 supra, the court will ignore the fact that the present claim— that the price at which the Company pur-

chased its stock exceeded the market price—is irreconcilable with the claims under sections 18(a) and 10(b) of the

the purchases placed the defendants in control of the Company whereby defendants were enabled to and did commit various acts of waste.

2. As to section 7(a) (4): various transactions in interstate commerce from 1955 to 1959 resulted in waste of corporate assets.

For purposes of this motion, defendants are willing to concede *arguendo* the truth of all plaintiffs' allegations, above, but claim that section 3(c) (9) of the 1940 Act exempts the Company from the provisions of the 1940 Act. Since the 1940 Act is inapplicable to the Company, defendants assert, no claims can be based on any alleged violations thereof. The consistency of this latter conclusion, as a matter of formal logic, cannot be denied. The critical issue, therefore, is whether, under section 3(c) (9) the Company has been exempted from the operation of the 1940 Act.

Section 3(c) (9) of the 1940 Act, 54 Stat. 799 (1940), 15 U.S.C. § 80a–3 (1958), provides as follows:

"(c) Notwithstanding subsections (a) and (b) of this section, none of the following persons is an investment company within the meaning of this subchapter:

\*　\*　\*　\*　\*　\*

"(9) Any company subject to regulation under the Interstate Commerce Act, or any company whose entire outstanding capital stock is owned or controlled by such a company: *Provided,* That the assets of the controlled company consist substantially of securities issued by companies which are subject to regulation under the Interstate Commerce Act."

The relevant undisputed facts are as follows:

1. The American-Hawaiian Steamship Company was incorporated in 1899 under the laws of New Jersey. As indicated by its certificate of incorporation, its principal purpose was the conduct of steamship business.

2. From the time of its incorporation, until 1953, with the exception of wartime interruptions, American-Hawaiian has been actively engaged in the intercoastal steamship trade. In 1953, intercoastal shipping activities were "temporarily" suspended.

3. Since 1953, with the exception of a single intercoastal voyage in June–July, 1955, American-Hawaiian has ceased all intercoastal shipping operations.

4. In June–July, 1955, American-Hawaiian transported a shipment of lumber on its vessel, the SS American, from Newport, Oregon to New York, New York.

5. Beginning in 1955 American-Hawaiian actively investigated the advisability of resuming large-scale intercoastal shipments. The possibility of resumption was dropped in 1957 as unfeasible.

6. On September 18, 1940 Part III of the Interstate Commerce Act was added, 54 Stat. 929, 49 U.S.C. §§ 901–923 (1958), bringing intercoastal water carriers, for the first time, under the regulation of the Interstate Commerce Commission (ICC).

7. On March 17, 1942, pursuant to the "grandfather" clause of 49 U.S.C. § 909 (a), the ICC issued to American-Hawaiian a certificate of public convenience and necessity, Docket No. W–475, to operate as a common carrier by water between certain designated Atlantic and Pacific ports. This certificate is still held by American-Hawaiian.

8. In 1956–1957, American-Hawaiian opposed, before the ICC, Pan-Atlantic S.S. Corporation's application for the issuance of a water carrier certificate authorizing the operation of a competing intercoastal shipping business. Pan-At-

1934 Act, considered above. For the purpose of the claims under sections 7 (a) (2) and 7(a) (4) of the 1940 Act, the court will assume that the price at which the Company purchased its stock did, in fact, exceed the market price for such stock.

lantic S.S. Corp.—Extension—Intercoastal, 303 I.C.C. 163 (1957).

9. On February 24, 1959, American-Hawaiian filed its notification of registration with the SEC and has, ever since, operated as a registered investment company.

In addition to the above facts, it is undisputed that the Company, during the period in question—1955 to 1959—filed certain reports with, and complied with certain regulations of, the ICC. The ultimate significance of such compliance, in the context of this case, however, is sharply disputed.

The basic contentions of the defendants are as follows:

1. The mere fact that the Company held a certificate of public convenience and necessity as a common carrier by water, during all times relevant herein, rendered the Company subject to regulation under the Interstate Commerce Act, and thus exempt under section 3(c) (9) of the 1940 Act.

2. At all relevant times, the Company was actually regulated by the ICC and, thus, exempt under section 3(c) (9) of the 1940 Act.

3. At least as concerns the Company's purchases of its stock in June, 1955, the Company was exempt under section 3(c) (9) of the 1940 Act because such purchases were coincidental with the June–July intercoastal voyage, pursuant to its certificate of public convenience and necessity, when the Company was actively engaged as a common carrier by water.

The basic contentions of the plaintiffs are as follows:

1. Mere possession of the certificate, without more, did not render the Company "subject to regulation under the Interstate Commerce Act" within the meaning of section 3(c) (9) of the 1940 Act; that in order to be subject to regulation by the ICC and hence exempt under section 3(c) (9) of the 1940 Act, the Company must be a common carrier by water within the meaning of 49 U.S.C. § 902(d); that is, the Company must "hold itself out to the general public" to engage in transportation by water.

2. One isolated intercoastal shipment does not satisfy the "holding out" requirement and, thus, at no relevant time was the Company exempt under section 3(c) (9) of the 1940 Act.

3. Any compliance with ICC regulations on the part of the Company was entirely gratuitous. Compliance was offered but not specifically sought. Penalties would not have been invoked for failure to comply. Thus, the Company was not "*subject* to regulation under the Interstate Commerce Act." [Emphasis added.]

Plaintiffs contend that there is a genuine issue of fact remaining as to whether, from 1955 to 1959, the relevant period, the Company "held itself out" to the general public as a carrier by water within the meaning of 49 U.S.C. § 902(d).

Defendants dispute the relevancy of "holding out" but contend that, if relevant, the Company, as a matter of law, did "hold itself out" to the public as a carrier by water. Further, however, if the court should determine that "holding out" does present a genuine issue of fact, defendants are willing to concede for purposes of this motion that the Company did not hold itself out to the public as a carrier during the relevant period.

49 U.S.C. § 902(d) provides as follows:

"The term 'common carrier by water' means any person which holds itself out to the general public to engage in the transportation by water in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation * * *."

Once the underlying facts are not disputed, as they are not in this case, what constitutes "holding out" within the meaning of the above statute (should such an issue prove relevant) is a question of law: the legal effect to

be given an undisputed set of facts. See Willheim v. Murchison, 231 F.Supp. 142, 144 (S.D.N.Y.1964), aff'd, 342 F.2d 33 (2d Cir. 1965).

In view of the foregoing, there are no genuine issues of fact. The court is, therefore, free to consider the remainder of defendants' motion for summary judgment on the merits.

The court will first assume that, the June–July, 1955 shipment notwithstanding, the Company, from 1953 to date, was a dormant carrier; that is, was not a "common carrier by water" within the definition of 49 U.S.C. § 902(d). The first issue then is whether a dormant water carrier, merely because it holds a certificate of public convenience and necessity, is exempt from the provisions of the 1940 Act under section 3(c) (9) thereof.

Only if the court concludes that a dormant water carrier is not exempt would it be necessary to decide the effect to be given the June–July, 1955 lumber shipment: whether the combined effect of that shipment and the fact that during 1955–1957 the Company looked into the feasibility of resuming intercoastal shipping and that in 1956–1957 the Company opposed the application of Pan-Atlantic before the ICC was such that the Company had the status of an active water carrier during all relevant times, or at least at the time of the 1955 stock purchases, sufficient to exempt the Company, under section 3(c) (9), from the 1940 Act.

Defendants' first argument premised on decisional law, is that a company holding a certificate of public convenience and necessity issued by the ICC is subject to ICC regulation and, therefore, exempt from the 1940 Act under section 3(c) (9). The principal cases relied on are Trailerships, Inc.—Certificate Transfer, ICC Finance Docket No. 19624 (Sept. 12, 1957); General Transp. Co. v. United States, 65 F.Supp. 981 (D.Mass.), aff'd per curiam, 329 U.S. 668, 67 S.Ct.

75, 91 L.Ed. 590 (1946); Quaker City Bus Co.—Purchase—Blackhawk Line, Inc., 38 M.C.C. 603 (1942) (report of the Commission on reconsideration).

In Trailerships, supra, Masters, a motor carrier, applied for a certificate as a coordinated motor-water service, relying on American, a water carrier with a certificate as the other part of the coordination. American, however, went bankrupt and ceased operations. In this same proceeding in which Masters sought its certificate for coordinated service, American sought permission from the ICC to transfer its water carrier certificate to Hudson River, which proposed then to render the water carriage part of Masters' coordinated service.

Protestants contended that, since at that time there was no water carrier presently in existence, Masters had not shown its ability to perform. Protestants claimed that a water carrier—not merely a water carrier certificate—must be in operation.

In response to these contentions, the Commission stated, at 14–15:

"We have on many occasions held that the possession of a certificate, in and of itself, and without performance of any transportation, constitutes the holder of such certificate a common carrier subject to the provisions of the [Interstate Commerce] act." [Citing Quaker City Bus Co., supra, and General Transport, supra.]

Defendants rely on the foregoing expression of ICC views. The Commission went on, however, in the same paragraph to qualify the statement above, as follows:

"That the mere transfer of the certificate does not create a water carrier service is without dispute. However, Hvide has stated his intention through Hudson River to resume the water carrier operation, and has taken definite steps towards

that goal by arranging for operating equipment."

The Commission approved the transfer of American's certificate to Hudson River and granted Masters' application for a certificate to operate a coordinated motor-water service.

In Quaker City Bus Co., supra, the Quaker City Bus Co. applied to the ICC for authority, under 49 U.S.C. § 5(2) (a) (i),[16] to purchase the operating rights of Blackhawk Line. In a prior proceeding, the application was dismissed because Blackhawk's receiver, the proposed seller, was found not to be a carrier within the meaning of 49 U.S.C. § 5(13) [17] and that the proposed transfer was, therefore, not within the scope of 49 U.S.C. § 5(2) (a) (i). The application was reopened, however, particularly in view of the decision handed down in Smith Bros.—Revocation of Certificate, 33 M.C.C. 465 (1942).

The Smith Bros. case was not cited by either party herein but will be discussed by the court because of its bearing on the cases relied upon by defendants.

The Commission stated, at 468–69, of its opinion in Smith Bros., as follows:

"The first question for determination is whether respondents ceased all operations authorized by the certificate * * *.

That question is one of fact * * *. It is clear that a person granted a certificate to operate as a common carrier by motor vehicle cannot continue to be recognized as such, as that term is defined in the act, unless it continues to engage in a bona fide operation as authorized by its certificate. What constitutes a bona fide operation depends on the facts in each case. A holding out or other evidence of intent to operate unless accompanied by actual operations does not constitute a bona fide operation. On the other hand, a slight interruption in service does not necessarily warrant a finding that a carrier has ceased to engage in a bona fide operation, but, conversely, it is not necessary that interruptions of service should rise to the height of an intentional abandonment before it can be found that a carrier has ceased to engage in a bona fide operation."

The Commission concluded that bona fide operations had ceased but went on to say, at 472:

"[I]rrespective of the self-executing forfeiture term or condition in respondents' certificate, the certificate continues in full force and effect unless and until terminated by us in

16. 41 Stat. 481 (1920), as amended, 49 U.S.C. § 5(2) (a) (1958):

"It shall be lawful, with the approval and authorization of the Commission * * *

"(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise; or for a person which

is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise * * *."

17. 48 Stat. 219–220 (1933), as amended, 49 U.S.C. § 5(13) (1958):

"As used in paragraphs (2)–(12) of this section, inclusive, the term 'carrier' means a carrier by railroad and an express company and a sleeping-car company, subject to this chapter; and a motor carrier subject to chapter 8 of this title; and a water carrier subject to chapter 12 of this title."

accordance with the provisions in section 212(a)." [18]

Thus, although no common carrier existed within the meaning of the statute, the certificate continued in effect until specifically revoked. The Commission held in the Smith Bros. case that, despite respondents' willful failure to comply with the terms of the certificate, since the respondents' receiver had so complied, the petition seeking revocation of respondents' certificate should be denied.

Accordingly, in Quaker City Bus Co., on the rehearing, the Commission said, at 606:

"The existence of a certificate creates a vested motor-carrier status which stays in force and effect for the life of the certificate. * * *

"Possession of a certificate, in and of itself, and without performance of any transportation, constitutes the holder thereof 'a motor carrier subject to part II.' It follows * * * that the receiver is a 'common carrier by motor vehicle' and the proposed transaction is one within the scope of section 5(2) (a) * * *."

Commissioner Mahaffie, joined by three other commissioners, dissenting, stated at 607:

"The finding in effect that one who happens to come into possession of a certificate issued by us, be he a pawnbroker, banker, shipper, or any other person, corporation or individual, thereby automatically becomes a 'motor carrier subject to part II' is directly contrary to any true concept of 'carrier' within the definition of 'common carrier by motor vehicle' as contained in the act. * * * [T]he statute specifically says that a common carrier by motor vehicle is

a person 'which holds itself out to the general public [, etc.] * * *.'

"Some misconception * * * arises from the report in the Smith Bros. case. The principal issue in that proceeding related to the procedure necessary in revoking a certificate. That case did not decide that the existence or nonexistence of 'carrier' status depends upon whether or not we have revoked the certificate."

If Commissioner Mahaffie's view of the majority opinion in the Quaker City Bus Co. case were correct, then the cases cited by defendants might be authority for their position which equates holding a certificate of public convenience and necessity with full carrier status and the full panoply of ICC regulation.

That, however, in this court's opinion, is not the proper interpretation of the majority opinion in Quaker City Bus Co. nor is it the proper interpretation of any of the cases cited by defendants or otherwise on this point.

All of the cases discussed above stand for the proposition that, although a person is no longer a carrier, the fact that it holds a certificate of public convenience and necessity is sufficient to give the ICC jurisdiction over it to approve a transfer of the certificate under section 5(2) (a).

If inactive carriers were not found to be "carriers" within the limited meaning of section 5(2) (a) (i), the logical consequence would be that _either_ a certificate would automatically terminate without ICC action—contrary to the specific language of section 212(a) [19]—upon the cessation of carrier operations; _or,_ if the certificate did not terminate, the ICC would have no authority to approve or

---

18. 49 Stat. 555 (1935), as amended, 49 U.S.C. § 312 (1958):

"(a) Certificates, permits, and licenses shall be effective from the date

specified therein, and shall remain in effect until suspended or terminated as herein provided."

19. Note 18, supra.

disapprove of transfers of valid operating authority, obviously contrary to the intent of Congress. The result reached in the above cases is the only practical one, if not entirely consistent in its logic.

The General Transp. Co. case, supra, also relied upon by defendants similarly holds only that a certificate, without more, constitutes the holder thereof a "carrier" for the limited purpose of conferring jurisdiction on the Commission to approve or disapprove of a transfer of the certificate under section 5(2) (a).

In Shamrock Van Lines, Inc.—Purchase—Arledge, 87 M.C.C. 326 (1961), the Commission, speaking of Quaker City Bus Co., said at 329:

> "[It] is merely authority for the proposition that this Commission does not lose its jurisdiction to consider a transaction under section 5 by virtue of the seller having discontinued or abandoned all of its operations."

Accord, e. g., Pan-Atlantic S.S. Corp.—Purchase—Agwilines, Inc., 85 M.C.C. 485, 489 (1960) ("carrier within the meaning of section 5(13)"); Bekins Moving & Storage Co.—Purchase—Farrington, 65 M.C.C. 56, 59 (1955) (" 'carrier' within the meaning of section 5"); Detroit & Cleveland Navigation Co.—Control—Denver-Chicago Trucking Co., 58 M.C.C. 599, 606–07 (1952); Transcon Lines—Purchase—Anderson Motor Service Co., 56 M.C.C. 521, 551 n. 9 (1950); Smith—Lease—Service, Inc., 55 M.C.C. 47, 52–53 (1948); Jones—Purchase—Cook, 50 M.C.C. 601, 606 (1948); Hancock Truck Lines, Inc.—Purchase—Spector Motor Service, Inc., 50 M.C.C. 509, 517 (1948); Bridgeways, Inc.—Purchase—Consolidated Freight Co., 50 M.C.C. 175, 180–81 (1947); Hubert—Purchase—Service Freight Lines, Inc., 45 M.C.C. 717, 725 (1947) ("jurisdiction to approve the purchase"); Farmer—Purchase—Crouse, 45 M.C.C. 267, 273 (1946); Bigge Drayage Co.—Purchase—Fitinghoff, 38 M.C.C. 633, 635–36 (1942) ("carrier within the meaning of section 5").

The distinction between carrier and certificate, for purposes of full ICC regulation—obscured by Commissioner Mahaffie in his dissenting opinion in Quaker City Bus Co., supra, and by defendants in the present case—was well brought out in the case of Lane—Revocation of Permit, 52 M.C.C. 427 (1951).

Lane held a permit to operate as a contract motor carrier. In 1938 she was forced, for reasons beyond her control, to cease carrier operations. The Commission held, at 432, that failure to conduct operations as a contract carrier was a basis for revocation of the permit under section 212(a) of the Interstate Commerce Act, 49 U.S.C. § 312(a). The Commission pointed out, at 432–33, that such a holding did not conflict with Quaker City Bus Co., as follows:

> "In Quaker City Bus Co.—Purchase—Blackhawk Line, Inc., 38 M.C.C. 603, the entire Commission said:
>
> > 'Possession of a certificate, in and of itself, and without performance of any transportation, constitutes the holder thereof "a motor carrier subject to part II." '
>
> "This statement is broad enough, if accepted literally, to negative our conclusion above that to be a contract carrier one must not only hold a permit but must engage in the business of a contract carrier. We do not believe, however, that it should be read without regard for the particular issue there involved. It is clear from the report in that case that it did not intend to deal with, much less preclude, the revocation under section 212(a) of a certificate or permit where the holder is not operating. All that the Commission meant, in our opinion, was that, so long as the certificate is not revoked in accordance with section 212(a), the certificate is in

existence and the symbol of a motor carrier 'for purposes of transfers under section 5.' The latter was the only purpose in connection with which the statement was made."

■ The conclusion to be drawn from the above cases is that defendants' contention—that the mere holding of a certificate of public convenience and necessity, without more, subjects the Company to ICC regulation *within the meaning of section 3(c) (9) of the 1940 Act*—must be rejected.

Plaintiffs rely on In the Matter of the Atlantic Coast Line Co., 9 S.E.C. 680 (1941) and the prolix "Alleghany litigation," [20] all involving section 3(c) (9) of the 1940 Act, as standing for the proposition that the Company, as a dormant water carrier, is not, as a matter of law, subject to regulation by the ICC within the meaning of section 3(c) (9) and, therefore, not exempt from coverage of the 1940 Act.

In the Atlantic Coast Line case the SEC had before it an application for an exemption from the 1940 Act on the basis of section 3(c) (9). Applicant was a holding company of railroads. Although the applicant itself did not operate any railroads in interstate commerce, its corporate charter, from the time of incorporation until 1929, authorized it to do so.

When, in 1927, applicant sought to issue stock, the question arose as to whether such issuance was subject to section 20a of the Interstate Commerce Act,[21] making it unlawful for a "carrier" to issue stock without authorization by the ICC. "Carrier" was defined, *inter alia*, as a "corporation organized for the purpose of engaging in transportation by railroad." Solely on the basis of the charter provision authorizing operation of a railroad, the ICC ruled that the 1927 stock issue was subject to ICC jurisdiction and section 20a of the Interstate

---

20. Breswick & Co. v. Briggs, 130 F.Supp. 953 (S.D.N.Y.1955); Breswick & Co. v. United States, 134 F.Supp. 132 (S.D. N.Y.1955) (three-judge court, per Dimock, J.); Breswick & Co. v. Briggs, 135 F.Supp. 397 (S.D.N.Y.1955) (Walsh, J.); Breswick & Co. v. United States, 138 F.Supp. 123 (S.D.N.Y.1956) (per curiam) (three-judge court), rev'd sub nom., Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957); Schwartz v. Bowman, 156 F. Supp. 361 (S.D.N.Y.1957) (Dimock, J.); Breswick & Co. v. United States, 156 F. Supp. 227 (S.D.N.Y.1957), on remand from 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed. 2d 726 (1957), rev'd per curiam sub nom., Alleghany Corp. v. Breswick & Co., 355 U.S. 415, 78 S.Ct. 421, 2 L.Ed.2d 374 (1958), complaint dismissed, 160 F.Supp. 754 (S.D.N.Y.1958). For an excellent review and discussion of the Alleghany litigation see Neisloss v. Bush, 110 U.S. App.D.C. 396, 293 F.2d 873 (1961) (Mr. Justice Reed, sitting by designation).

21. 41 Stat. 494–495 (1920), 49 U.S.C. § 20a(2) (1958):
"It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed 'securities') or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such issue or assumption. The commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose."

Commerce Act. Stock of Atlantic Coast Line Co., 131 I.C.C. 345 (1927).

In 1929, the corporate charter was amended and that portion authorizing operation of a railroad was deleted. Applicant claimed, however, that it was nevertheless still subject to ICC jurisdiction and exempt under 3(c)(9) from the 1940 Act on the ground that the 1927 decision of the ICC remained in force and effect since it had never been amended, altered or revoked.

The Commission answered, at 682–84, as follows:

"It is evident, however, that the Interstate Commerce Commission has not had occasion to take any further specific action in this regard, as the company has not sought to issue any further securities.

" * * * We cannot find that the Interstate Commerce Commission has taken any action whatever, since the charter amendment of 1929, which would indicate that it asserts a continuing jurisdiction over the applicant company as a 'carrier.' * * *

"The opinion of that commission in 1927 was clear as to the basis on which jurisdiction was asserted, and that basis has been removed by amendment to the applicant's charter. We conclude that the applicant has failed to demonstrate that it is subject to the provisions of Section 20a of the Interstate Commerce Act either in respect of the issuance of the securities or in respect of interlocking officers and directors.

" * * * The applicant concedes that it is not under any duty to file periodic or special reports with the Interstate Commerce Commission, and that the manner in which it keeps its accounts and records is not regulated under the Interstate Commerce Act."

The Commission then went on to review the legislative history of section 3(c)(9) specifically in reference to railroad holding companies, concluding, at 684, that "railroad holding companies were not regarded as companies regulated under the Interstate Commerce Act, and were not intended to be excluded from the Investment Company Act."

Speaking more generally, the Commission said at 685:

"Clearly, Section 3(c)(9) was intended to avoid 'conflict and confusion' which might be expected to arise if railroads and their subsidiaries were subjected to the jurisdiction of two regulatory commissions in respect of such matters as issuance of securities, interlocking officers and directors, the manner of keeping accounts and records, and the filing of reports. As we have seen, the applicant is not at present subject to regulation under the Interstate Commerce Act either in those or in other respects, but is rather subject to certain powers designed to aid the Interstate Commerce Commission in regulating the railroads controlled by the applicant and, possibly, in formulating recommendations for new legislation to regulate holding companies like the applicant."

Thus, the Commission held, the applicant was not exempt under section 3(c)(9).

If the Company were, as a matter of law or as a matter of fact, not regulated in any manner whatsoever, voluntarily or otherwise, by the ICC, then the exemption under section 3(c)(9) could not apply. Once there is any regulation by the ICC, then the issue, under the rationale of Atlantic Coast Line, is whether that regulation is of the kind envisioned in section 3(c)(9) as the basis for the exemption.

By virtue of factual distinctions between Atlantic Coast Line and the case at bar—chiefly the circumstance that the Company herein holds a certificate and does not concede that it is under no duty to file reports with the ICC, which it

continues to do—the Atlantic Coast Line case is not authority for the proposition that a dormant water carrier is not regulated in any manner by the ICC. Nor is it authority for the proposition that the Company herein is not subject to regulation under the Interstate Commerce Act within the meaning of section 3(c) (9).

While Atlantic Coast Line is not dispositive of the issue of the Company's exemption under section 3(c) (9), it does provide a frame of reference for the following analysis of the Company's status with respect to that section.

For purposes of this motion, the facts and issues of the Alleghany litigation will be greatly simplified. The facts, as relevant, are as follows: In an order by the ICC dated June 5, 1945, Chesapeake & O. Ry.—Purchase, 261 I.C.C. 239, the Alleghany Corporation was accorded the status of a non-carrier "considered as a carrier" under the authority of section 5(3) of the Interstate Commerce Act.[22] That order was in conjunction with and part of an order under section 5(2) of the Interstate Commerce Act [23] authorizing the Chesapeake & Ohio Railway, controlled by Alleghany, to acquire another carrier. As stated by Judge Dimock in Breswick & Co. v. United States, 134 F. Supp. 132, 142 (S.D.N.Y.1955) (three-judge court considering application for preliminary injunction):

"In making the order of June 5, 1945, the I.C.C. made, among others,

the finding, p. 261, that 'acquisition by Alleghany Corporation of control, through ownership of stock \* \* \* of Chesapeake & Ohio \* \* \* is a transaction within the scope of section 5(2) of the Interstate Commerce Act \* \* \*' and provided in the order that 'unless and until otherwise ordered by this Commission said Alleghany Corporation shall be considered as a carrier subject to the provisions of Section 20(1) to (10), inclusive, and Section 20a(2) to (11) inclusive, of the Interstate Commerce Act'."

On January 19, 1954, Alleghany divested itself of the Chesapeake & Ohio stock that it had theretofore held.

One of the issues in the Alleghany litigation was whether the ICC order of June 5, 1945 was in force in May, 1955, when an issuance of preferred stock by the Alleghany Corporation was approved by the ICC pursuant to section 20a of the Interstate Commerce Act, but was not approved by the SEC. But for the exemption under section 3(c) (9), SEC approval would have been required. With reference to this issue, Judge Dimock stated, Breswick & Co. v. United States, 134 F.Supp. at 142:

"Whatever might have been the terms of the order of June 5, 1945, they could not have conferred upon Alleghany qualifications to be 'con-

22. 48 Stat. 217–218 (1933), as amended, 49 U.S.C. § 5 (1958):

"(3) Whenever a person which is not a carrier is authorized, by an order entered under paragraph (2) of this section, to acquire control of any carrier or of two or more carriers, such person thereafter shall, to the extent provided by the Commission in such order, be considered as a carrier subject to such of the following provisions as are applicable to any carrier involved in such acquisition of control: Sections 20(1)–(10), 304(a) (1) and (2), 320 and 913 of this title, (which relate to reports, accounts, and so forth, of carriers), and sections 20a (2)–(11), and 314 of this title, (which relate to issues of securities and as-

sumptions of liability of carriers), including in each case the penalties applicable in the case of violations of such provisions. In the application of such provisions of sections 20a and 314 of this title, in the case of any such person, the Commission shall authorize the issue or assumption applied for only if it finds that such issue or assumption is consistent with the proper performance of its service to the public by each carrier which is under the control of such person, that it will not impair the ability of any such carrier to perform such service, and that it is otherwise consistent with the public interest."

23. For the text of section 5(2) (a) (i), see note 16 supra.

sidered as a carrier' which it did not possess. From the instant of Alleghany's relinquishment of control of the C. & O. * * *, plaintiffs here were entitled to the special protection which Congress has provided for stockholders in investment companies which do not control railroads. Although failure to apply for vacation of the order might estop Alleghany, it could not shield it from the S.E.C. and it would not be binding upon such third persons as stockholders of Alleghany. As to all except Alleghany, which had accepted the 1945 order as it read, its provision for regulation by the I.C.C. after the factual basis for I.C.C. jurisdiction ceased, was empty fiat."

A three-judge district court, considering the subject matter of Breswick on the merits, affirmed Judge Dimock's statement, above, as to the lack of continuing effect of the 1945 ICC order after the divestiture by Alleghany of its Chesapeake & Ohio stock. 138 F.Supp. 123, 129 (1956) (dictum). In so doing, however, that court pointed out, at 128, that an order under section 5(3) of the Interstate Commerce Act was not subject to the provisions of section 15(2) of that Act, 34 Stat. 589 (1906), as amended, 49 U.S.C. § 15(2) (1958), which provides:

"* * * all orders of the Commission * * * shall take effect within such reasonable time, not less than thirty days, and shall continue in force until its further order, or for a specified period of time, according as shall be prescribed in the order, unless the same shall be suspended or modified or set aside by the Commission, or be suspended or set aside by a court of competent jurisdiction."

The inference to be drawn from the court's reference to section 15(2) is that, had that section been applicable, the 1945 ICC order would have been in effect in May, 1955 and, under section 3(c) (9), would have precluded SEC jurisdic-

tion over the preferred stock issuance. The decision of the three-judge court on the merits was reversed on other grounds, sub nom., Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957).

In Schwartz v. Bowman, 156 F.Supp. 361 (S.D.N.Y.1957), the issue as to the applicability of the Investment Company Act was again raised. The defendant's contentions were stated by Judge Dimock, at 364:

"Moving defendants marshal additional material in opposition to this interpretation of section 15(2) [that in Breswick, 138 F.Supp. at 128] and ask me to depart from the dictum in the Breswick case. I have concluded, however. that, even were I to do so and hold that section 15(2) might apply in a proper case to an order other than a rate order, Alleghany must nevertheless * * be considered as subject to the Investment Company Act from the instant of its divestiture of its subsidiary carriers."

Judge Dimock arrived at this conclusion by the following reasoning, at 364:

"It was * * * the duty of Alleghany to apply for authority to divest itself of control of the C & O. If it had done so and authority had been granted, the ICC would have been bound to terminate any order which gave to the ICC authority over Alleghany based on Alleghany's control of the C & O. Now we are told by the moving defendants that, because of Alleghany's failure to perform its duty, it has averted the supervision by the Securities and Exchange Commission that would have resulted had it performed its duty. I cannot accept that conclusion."

Defendants seek to turn the Alleghany litigation to their own use by the following argument. The inference to be drawn from Breswick & Co. v. United States, 138 F.Supp. at 128, and enforced by Schwartz v. Bowman, 156 F.Supp. at 364, is that were the 1945 ICC

order, designating Alleghany a non-carrier considered as a carrier, to continue in force regardless of the factual basis therefor, then the 1955 stock issuance would have been exempt from SEC regulation by virtue of section 3(c) (9). A fortiori were a certificate of public convenience and necessity issued to a person actually a carrier to continue in force regardless of the factual basis therefor, the stock issuance would likewise have been exempt. Under the authority of the many cases discussed above, it is beyond dispute that a certificate does continue in force regardless of the factual basis therefor.

Thus, defendants convincingly bring themselves within the reasoning which found section 15(2) of the Interstate Commerce Act to be an obstacle in Breswick and Schwartz, above.

 Defendants point out that under the authority of United States v. Seatrain Lines, Inc., 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1947), a certificate of public convenience and necessity issued to a water carrier is irrevocable except by a specific act of Congress. Since, therefore, the Company's certificate was irrevocable, nothing it did or did not do would have presented the ICC with a situation in which it would have been called upon to terminate its jurisdiction. Thus, the estoppel rationale utilized by Judge Dimock in Schwartz is inapplicable to the facts of the case at bar.

The court is of the opinion that defendants' argument answers plaintiffs' contention that the Alleghany litigation is entirely dispositive of any claim of exemption under section 3(c) (9).

On the other hand, however, the Alleghany litigation does not establish that, as a matter of law, the Company after 1953 was exempt from the Investment Company Act.

Although the court concurs with defendants to the extent that the fact of holding a certificate issued by the ICC gave the ICC *jurisdiction* over the Company, the court disagrees with defendants' major premise—that the mere existence of ICC jurisdiction, by itself, is sufficient to exempt the Company under section 3(c) (9). Such an interpretation of the Alleghany litigation goes too far. See Breswick & Co. v. United States, 156 F.Supp. 227, 234 n. 15 (S.D. N.Y.1957).

Both the Atlantic Coast Line case, supra, and the Alleghany litigation demonstrate the futility of attempting to determine the Company's status under section 3(c) (9) without regard to the legislative history and purposes to be served by that particular section.

The court is guided in the proper framing of the issue now before it by Mr. Justice Brennan's approach in his concurring opinion in S. E. C. v. Variable Annuity Life Insurance Co., 359 U.S. 65, 73, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), ("VALIC"). The crucial question in that case was whether a company selling variable annuities was an insurance company within the meaning of section 3(c) (3) of the 1940 Act and thus exempt therefrom.

Justice Brennan first discussed the rationale for exempting insurance companies from the Investment Company Act of 1940 in light of the purposes to be served by that Act. He then determined that this rationale would not be served by also exempting a company with the characteristics of a variable annuity company and, thus, such companies were not exempt under 3(c) (3).

In the course of his opinion, Mr. Justice Brennan stated, at 76, 79 S.Ct. at 624:

"But if a brand-new form of investment arrangement emerges which is labeled 'insurance' or 'annuity' by its promoters, the functional distinction that Congress set up in 1933 and 1940 must be examined to test whether the contract falls within the sort of investment form that Con-

gress was then willing to leave exclusively to the State Insurance Commissioners. In that inquiry, an analysis of the regulatory and protective purposes of the Federal Acts and of state insurance regulation as it then existed becomes relevant."

Cf. Prudential Ins. Co. of America v. S. E. C., 326 F.2d 383 (3d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1629, 12 L.Ed.2d 497 (1964).

Utilizing Mr. Justice Brennan's approach, this court formulates the basic issue now under discussion as follows: is the regulation to which the Company is or may be subject by the ICC, under the authority of the Interstate Commerce Act, by virtue of its holding a certificate of public convenience and necessity, the type of regulation intended under section 3(c) (9) of the 1940 Act as the basis for the exemption accorded "any company subject to regulation under the Interstate Commerce Act"?

In resolving this issue, the court will be guided by the general purposes of the Investment Company Act of 1940, as stated in section 1(b) therein, 54 Stat. 790 (1940), 15 U.S.C. § 80a–1(b) (1958):

"(b) Upon the basis of facts disclosed by the record and reports of the Securities and Exchange Commission made pursuant to section 79z—4 of this title, and facts otherwise disclosed and ascertained, it is declared that the national public interest and the interest of investors are adversely affected—

"(1) when investors purchase, pay for, exchange, receive dividends upon, vote, refrain from voting, sell, or surrender securities issued by investment companies without adequate, accurate, and explicit information, fairly presented, concerning the character of such securities and the circumstances, policies, and financial responsibility of such companies and their management;

"(2) when investment companies are organized, operated, managed, or their portfolio securities are selected, in the interest of directors, officers, investment advisers, depositors, or other affiliated persons thereof, in the interest of underwriters, brokers, or dealers, in the interest of special classes of their security holders, or in the interest of other investment companies or persons engaged in other lines of business, rather than in the interest of all classes of such companies' security holders;

"(3) when investment companies issue securities containing inequitable or discriminatory provisions, or fail to protect the preferences and privileges of the holders of their outstanding securities;

"(4) when the control of investment companies is unduly concentrated through pyramiding or inequitable methods of control, or is inequitably distributed, or when investment companies are managed by irresponsible persons;

"(5) when investment companies, in keeping their accounts, in maintaining reserves, and in computing their earnings and the asset value of their outstanding securities, employ unsound or misleading methods, or are not subjected to adequate independent scrutiny;

"(6) when investment companies are reorganized, become inactive, or change the character of their business, or when the control or management thereof is transferred, without the consent of their security holders;

"(7) when investment companies by excessive borrowing and the issuance of excessive amounts of senior securities increase unduly the speculative character of their junior securities; or

"(8) when investment companies operate without adequate assets or reserves.

"It is declared that the policy and purposes of this subchapter, in accordance with which the provisions of this subchapter shall be interpreted, are to mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors."

In Brown v. Bullock, 194 F.Supp. 207 (S.D.N.Y.), aff'd, 294 F.2d 415 (2d Cir. 1961), in which extensive consideration was given to the legislative history of the Investment Company Act of 1940, at 217–219 of 194 F.Supp., this court said of section 1(b), at 218: "Congress built into the statute a canon of construction. * * * This is more than a mere exordium. It is a directive to the courts."

 Thus, the exemption provisions of section 3 of the 1940 Act must be narrowly construed in order to give the greatest effect to the "detailed protections of the 1940 legislation." VALIC, 359 U.S. at 85, 79 S.Ct. at 629.

During the Senate hearings on the bill which was to evolve into the 1940 Act, S.3580, Mr. R. V. Fletcher, General Counsel of the Association of American Railroads, first suggested the inclusion of an exemption of the type embodied in section 3(c) (9). As the basis for an amendment exempting carriers, railroads in particular, Mr. Fletcher referred to the then pending S.2903, a proposed amendment to the Interstate Commerce Act. In his statement, Mr. Fletcher said:

"It has been the general policy of Congress to exempt from regulating statutes having to do with the issuance and sale of securities all such activities of railroads and their af-

filiates as are controlled by the Interstate Commerce Commission. Quite obviously such a policy is wise because there should not be any overlapping of authority or any conflict between two Government agencies. Upon these considerations the acts relating to the work of the Securities and Exchange Commission invariably provide for the exemption of railroads with respect to all features that are under the control of the Interstate Commerce Commission."

S.2903 provided for extensive regulation by the ICC over the issuance and purchase of securities by railroads. This was to be accomplished by amendments to sections 20 and 20a of the Interstate Commerce Act and the inclusion of a new section, section 20b. For the complete text of S.2903, showing the original Interstate Commerce Act and the proposed amendments thereto, see the Appendix to S.Rep.1005, 76th Cong., 1st Sess., Calendar No. 1049 (July 27, 1939).

S.2903 passed the Senate on August 1, 1939 and was referred to the House Committee on Interstate and Foreign Commerce on August 5, 1939, where it died. It was never reported out of committee.

There were no provisions similar to those of S.2903 in the Interstate Commerce Act of 1940, S.2009, 76th Cong. (the "Wheeler-Lea" bill) that was finally enacted. Nevertheless, the section 3(c) (9) exemption of the Investment Company Act survived.

The survival of section 3(c) (9) is explained as follows in the *amicus curiae* brief filed by the SEC, p. 22:

"The rationale still remained—conflicting or overlapping authority of regulatory agencies is to be avoided. Thus in a discussion of the provisions of H.R.10065, ultimately enacted as the Investment Company Act, it was stated: [24]

24. Hearings on H.R. 10065 Before the Subcommittee of the House Committee on Interstate and Foreign Commerce,

76th Cong., 3d Sess. 103 (June 14, 1940) (remarks of Mr. Schenker. Chief Counsel, Investment Trust Study, SEC).

" ' * * * we put that [Section 3 (c) (9)] in because of the Wheeler-Lea bill. *If that bill passes*, then those companies will be under the jurisdiction of the Interstate Commerce Commission.' " [Emphasis supplied by the court.]

The difficulty with the explanation offered by the SEC is to be found in the italicized portion of the above-quoted statement. The Wheeler-Lea bill, as passed, did not in any way affect the ICC's regulation over carriers vis-à-vis securities. That bill left unchanged sections 20 and 20a of the Interstate Commerce Act. The words "if that bill passes" may be attributed to some inaccuracy engendered by confusing the Wheeler-Lea bill that was finally enacted, September 18, 1940, with S.2903, also sponsored by Senator Wheeler, then in committee, but which was not enacted.

Notwithstanding the above-noted possible confusion, the court agrees that the purpose of section 3(c) (9) was to avoid conflicting and overlapping regulation by two federal agencies. The court must scrutinize claims of exemption under section 3(c)(9) in the light of its legislative history and its avowed objectives.

Administrative and judicial interpretation of section 3(c) (9) articulates distinctly the underlying purpose of that exemption. To reiterate the quotation, above, from *Atlantic Coast Line*, 9 S.E.C. at 685:

"Clearly, Section 3(c) (9) was intended to avoid 'conflict and confusion' which might be expected to arise if railroads and their subsidiaries were subjected to the jurisdiction of two regulatory commissions * * *."

This same statement was quoted with approval in In the Matter of Alleghany Corp., 20 S.E.C. 731, 735 (1945), discussed infra.

In Breswick & Co. v. United States, 156 F.Supp. 227 (S.D.N.Y.1957), rev'd per curiam on other grounds sub nom., Alleghany Corp. v. Breswick & Co., 355 U.S. 415, 78 S.Ct. 421, 2 L.Ed.2d 374 (1958), the three-judge court, per Judge Walsh, stated in a footnote, at 234 n. 15 of 156 F.Supp.:

"By exempting carrier securities from any state or Securities and Exchange Commission regulation, Congress has given further evidence that it looks to the I.C.C. to protect the welfare of investors in considering stock issues under § 20a. It is impossible to believe that Congress could have intended investors in securities to be left without any of the protections afforded other investors. When Congress exempted corporations like Alleghany from compliance with the provisions of the Investment Company Act, it manifested no intent to deprive stockholders in such companies of the safeguards provided for other investment companies, but merely an intent to avoid dual regulation."

In the Matter of Alleghany Corp., 20 S.E.C. 731 (1945) is instructive as to what the Securities and Exchange Commission deemed to be the areas of overlapping and conflicting regulation within the meaning of section 3(c) (9).

In that case Alleghany Corporation applied to the SEC for an order, under section 8(f) of the 1940 Act, 54 Stat. 803 (1940), 15 U.S.C. § 80a–8(f) (1958), that it had ceased to be an investment company within the meaning of the 1940 Act. The basis for the application was the 1945 ICC order, discussed *supra*, subjecting Alleghany to ICC regulation.

The Commission stated, at 734:

"The question presented in brief is whether this order of the Interstate Commerce Commission has the effect of making Alleghany 'subject to regulation by the Interstate Commerce Act.' It would therefore appear appropriate to examine the provisions of the Interstate Commerce

Act, as amended, to determine the extent to which Alleghany has been subjected to regulation thereunder."

The Commission then reviewed sections 20, 20a, 12(1) and 5(2) of the Interstate Commerce Act, all of which Alleghany might be subject to at one time or another, and went on to say, at 735:

"The remaining provisions of the Interstate Commerce Act deal primarily with matters which would relate only to an operating carrier (such as safety appliances, rates and rebates, services, routes, etc.) and the organization and operation of the Interstate Commerce Commission."

The Commission concluded that the type of regulation by the ICC to which Alleghany might be subject was within that intended by section 3(c) (9); and the order under section 8(f) issued accordingly.

In Atlantic Coast Line, 9 S.E.C. at 685, the Commission again indicated the areas of possible overlapping regulation to be "issuance of securities, interlocking officers and directors, the manner of keeping accounts and records, and the filing of reports."

■ According to the above analysis by the SEC, with which this court agrees, the only meaningful issue in this case is to what extent, if at all, is the defendant American-Hawaiian Steamship Company subject to regulation by the ICC under sections 20, 20a, 12(1) and 5(2), or comparable sections, of the Interstate Commerce Act. If the Company is or may be regulated by the ICC as to these matters, then it is of no significance that it is not an operating water carrier. Similarly, if there is no regulation as to these matters, then, even if the Company were an actively operating carrier, it would not be entitled to an exemption under section 3(c) (9).

Sections 20(1)–(10) of the Interstate Commerce Act, 24 Stat. 386 (1887), as amended, 49 U.S.C. § 20(1)–(10) (1958), applicable to railroads, provide generally

for the filing of reports as prescribed by the Commission, the keeping of records— including a uniform system of accounts and depreciation charges as prescribed by the Commission—and penalties and enforcement by mandamus against those who make false statements in reports or otherwise fail to comply with the provisions of the section.

Section 12(1) of the Interstate Commerce Act, 24 Stat. 383 (1887), as amended, 49 U.S.C. § 12(1) (1958), also applicable to railroads, provides for Commission authority to "inquire into and report on the management" of carriers by rail subject to its jurisdiction.

Section 5(2) of that Act (discussed in note 16 supra and accompanying text) provides generally for Commission approval or authorization of the merger, consolidation and acquisition of carriers, their properties or franchises.

Section 20a of that Act, note 21 supra, provides for ICC regulation over the issuance of securities or assumption of debt by railroads and curtails the establishment of interlocking directors.

In addition to those sections noted in In the Matter of Alleghany, supra, sections 19a and 20b of the Interstate Commerce Act are also relevant.

Section 19a, 37 Stat. 701 (1913), as amended, 49 U.S.C. § 19a (1958), provides for ICC regulation over the valuation of all property owned by a railroad.

Section 20b, added in 1948, 62 Stat. 163 (1948), 49 U.S.C. § 20b (1958), (not to be confused with the proposed section 20b of S. 2903, supra, which was never enacted) provides for ICC regulation over the modification of financial structures of railroads.

From 1887 until 1935, only railroads were regulated under the Interstate Commerce Act. In 1935 Part II of the Interstate Commerce Act, applicable to motor carriers, was added.

On September 18, 1940, just about a month after the enactment of the Investment Company Act of 1940, Part

III of the Interstate Commerce Act was added, bringing water carriers, for the first time, under ICC jurisdiction.

The following chart shows how the relevant sections of Part I were or were not carried over into Parts II and III:

| SUBJECT MATTER REGULATED | RAILROADS PART I | MOTOR CARRIERS PART II | WATER CARRIERS PART III |
|---|---|---|---|
| Consolidation, merger and acquisition of carriers | 5(2)(a)(i) | 5(2)(a)(i) (Made applicable by § 5(13)) | 5(2)(a)(i) (Made applicable by § 5(13)) |
| Transfer of certificate or permit | 5(2)(a)(i) (By implication) | 312(b) (Specifically referring to § 5) | 912 |
| Management (power to inquire into and report on) | 12(1) | 304(a)(7) | 904(b), 916(a) |
| Valuation of property | 19a | ——— | ——— |
| Reports, records and accounts | 20 | 320 | 913 |
| Issuance of securities and interlocking directors | 20a | (Specifically making § 20a applicable) 314 | ——— |
| Modification of financial structures | 20b | ——— | ——— |

Two facts emerge from a reading of the above chart:

1. There is a far greater area of potentially overlapping regulation by the ICC and SEC of railroads than either of the two other classes of carriers;

2. Only as to water carriers is there no ICC regulation whatsoever over the issuance of securities.

These facts, in turn, pose three questions:

*Question (1).* Was the section 3(c) (9) exemption of the 1940 Act aimed only at railroads in view of the great likelihood of extensively overlapping regulation by the ICC and the SEC, as is demonstrated by the above chart?

*Question (2).* If water carriers are exempted from the provisions of the 1940 Act by the literal application of section 3(c) (9) of the 1940 Act, would investors in the securities of water carriers —by virtue of the fact that there is no ICC regulation as to the issuance of such securities—receive less protection of the type provided for in the 1940 Act than investors in the securities of railroads

and motor carriers, the issuance of which latter securities *is* regulated by the ICC?

*Question (3).* Does the potentially overlapping regulation by the ICC and the SEC as to water carriers constitute a sufficient administrative evil (of the kind feared by Congress) as to require the exempting of water carriers from the 1940 Act (viz., SEC regulation) which exemption would be achieved through the application of section 3(c) (9) of the 1940 Act?

For purposes of this case (which involves only water carriers), we need answer only questions "(2)" and "(3)".

To answer the second question above, it is necessary to review certain provisions of the securities laws. This review, as will now be set forth, demonstrates that the investors in carrier securities—regardless of any classification into water carriers, railroads and motor carriers—are exposed to the *same* lack of legislative protection of the character afforded by the Investment Company Act of 1940 if the exemption provision of the 1940 Act, section 3(c) (9), is applied to all such carriers.

The Securities Act of 1933 is, in a very general sense, coextensive in scope with section 20a of the Interstate Commerce Act: both regulate the issuance of securities.[25] This parallelism explains why section 3(a) (6) of the 1933 Act, 48 Stat. 76 (1933), 15 U.S.C. § 77c (1958) specifically exempts from the coverage of the 1933 Act "Any security issued by a common or contract carrier, the issuance of which is *subject to the provisions of section 20a of Title 49.*" [Emphasis added.]

The immediately apparent fact is that securities issued by water carriers—because water carriers are *not* covered by section 20a of the Interstate Commerce Act—are not exempt from coverage under the 1933 Act. Consequently, the Securities and Exchange Commission has jurisdiction over and regulates the issuance of securities by water carriers.

As Professor Loss said, 1 Loss, op. cit. supra at 130: "Whereas the 1933 act is concerned primarily with the distribution process, the 1934 act has to do with post-distribution trading."

The Interstate Commerce Act does not contain a provision regulating post-distribution trading. Carriers and their securities, therefore, were not exempted from the regulatory provisions of the Securities Exchange Act of 1934.

In Brown v. Bullock, 194 F.Supp. at 217, the court referred to the legislative purpose of the Investment Company Act of 1940 as follows:

"The Act is to be sharply contrasted with the much narrower Securities Act of 1933 and the Securities Exchange Act of 1934. The 1933 and 1934 Acts articulated only a policy of disclosure and securities registration and the regulation of certain securities practices. On the other hand, the 1940 Act placed the investment company business under close but workable regulation. One of the cogent reasons for the passage of the 1940 Act was the inadequacy of the 1933 and 1934 Acts to cope with the grave abuses and evils that had developed in some quarters of the investment company business."

In light of the "inadequacy of the 1933 and 1934 Acts to cope with the grave abuses and evils" which were found to have developed in the investment company business, it is strikingly significant that Congress chose, by enacting section 3(c) (9) of the 1940 Act, to exempt from the 1940 Act all carriers subject to regulation under the Interstate Commerce Act.

The realistic result is that a person who invests in the securities of a carrier—which, *but for* section 3(c) (9) of the 1940 Act, would have been subject to the regulatory provisions of the 1940 Act —is, by *force* of the exemption created by section 3(c) (9), given only the "in-

---

25. See Hearings on S. 1181 Before a Subcommittee of the Senate Committee on Banking and Currency, 86th Cong., 1st Sess. 212 (1959) (remarks of Mr. Ginnane, General Counsel, Interstate Commerce Commission).

adequate" protection afforded by the 1933 and 1934 Acts; and this inadequacy of protection follows from the circumstance that nowhere in the Interstate Commerce Act is there provision for investor protection of the character supplied by the 1940 Act.[26]

 Section 20a of the Interstate Commerce Act—which is limited to railroads and motor carriers, as already noted—does not apply to water carriers. However, even with respect to railroads and motor carriers, section 20a of the Interstate Commerce Act affords protection only with respect to the issuance of securities and does not afford protection of the character afforded by the Investment Company Act of 1940.

Thus, investors in the securities of carriers—regardless of the kinds of carriers—are not given the protection supplied by the Investment Company Act of 1940, if the exemption granted by section 3(c) (9) of the 1940 Act is literally applied to all carriers.

To restate the answer to the second question above: if the exemption in section 3(c) (9) of the 1940 Act were literally applied to water carriers as well as to other carriers, investors in the securities of water carriers would not receive less protection of the character afforded by the 1940 Act than investors in the securities of railroads or motor carriers because the investors in the securities of all classes of carriers are equally unprotected so far as concerns the type of protective regulation provided for in the 1940 Act.

Hence, the court's review thus far discloses no meaningful distinction *in terms of protective statutory coverage* as the basis for varying the application of section 3(c) (9) of the 1940 Act as between water carriers, on the one hand, and the two other classes of carriers on the other hand.

However, as will now be demonstrated in answering the third question above, a meaningful distinction between the three classes of carriers does exist *in terms of potentially overlapping administrative regulation.* And this distinction does constitute a sound basis for differentiating between water carriers and the other two classes of carriers in determining

26. See Hearings on H.R. 2481 Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 86th Cong., 1st Sess. 124 (1959) (statement by the SEC); id. at 140–41, 396 (remarks of Mr. Gadsby, Chairman of the SEC); id. at 404–15 (memorandum of the SEC); Hearings on S. 1181 Before a Subcommittee of the Senate Committee on Banking and Currency, 86th Cong., 1st Sess. 207–13 (1959) (remarks of Mr. Baker, Director of Finance, and Mr. Ginnane, General Counsel, Interstate Commerce Commission).

H.R. 2481 and its Senate counterpart, S. 1181, the bills involved in the above hearings, contained extensive proposed amendments to the 1940 Act. One such amendment was directed at section 3(c) (9) of the 1940 Act and would have limited that section's exemption accorded companies subject to regulation under the Interstate Commerce Act by adding the proviso that "this exception shall not apply to a company which the Commission finds and by order declares to be primarily engaged, directly or indirectly, in the business of investing, reinvesting, owning, holding, or trading in securities." H.R. 2481 § 7, 86th Cong., 1st Sess. (1959). The text of H.R. 2481 appears at pages 94–99 of the Hearings held thereon, supra.

Seizing upon the fact that the proposed amendment to section 3(c) (9) of the 1940 Act was not enacted, defendants argue that any judicial promulgation of a rule approaching in result, to any extent, the result which would have been achieved by the proposed amendment quoted above would constitute judicial usurpation of the legislative function.

There is, however, no merit to this argument. To attribute to Congress an *affirmative* intention on the basis of its *failure* to do something is always extremely questionable and is particularly so in the present case in light of the wholly inconclusive history of H.R. 2481 and S. 1181. See 105 Cong.Rec. 2980 (1959) (S. 1181 referred to the Senate Committee on Banking and Currency); 106 Cong.Rec. 18397 (1960) (H.R. 2481 reported out of committee with the unanimous approval of the full committee); 106 Cong.Rec. 18401 (1960) (H.R. 2481 passed the House).

that section 3(c) (9) should not be applied to water carriers; that is, that water carriers are not exempt from the Investment Company Act of 1940.

Reference to the chart, above, reveals that, as to *motor carriers,* there are three main areas of ICC regulation which might conflict with regulation by the SEC pursuant to the 1940 Act if companies subject to regulation under the Interstate Commerce Act were not exempted from the 1940 Act by section 3(c) (9): (a) the issuance of securities, (b) the keeping of accounts and records, and (c) the necessity of approval by the ICC of all consolidations, acquisitions and mergers of carriers, their properties or franchises.[27]

Because section 20a of the Interstate Commerce Act is inapplicable to water carriers, the SEC and not the ICC regulates the issuance of the securities of water carriers. This eliminates—as to water carriers—one possibility of overlapping regulation.

There are, however, two remaining possibilities of overlapping regulation by the ICC and the SEC as to water carriers, which must be explored in order to determine whether such possibilities justify applying section 3(c) (9) of the 1940 Act to water carriers in order to exempt water carriers from SEC regulation. These two possibilities are as follows:

1. as to accounts and records (under section 913 of the Interstate Commerce Act, and, mainly, sections 30 and 31 of the 1940 Act); and

2. as to approval of certain transactions (under section 5(2) (a) (i) of the Interstate Commerce Act, and section 17 of the 1940 Act).

Under section 30(a) of the 1940 Act, 54 Stat. 836 (1940), 15 U.S.C. § 80a–29 (1958),

"(a) Every registered investment company shall file annually with the Commission such information, documents, and reports as investment companies having securities registered on a national securities exchange are required to file annually *pursuant to section 78m(a)* of this title and the rules and regulations issued thereunder." [Emphasis added.]

Under section 78m of Title 15 (section 13(b) of the 1934 Act), records filed with the ICC pursuant to section 20 of the Interstate Commerce Act will suffice. Thus, section 30(a) of the 1940 Act presents no problem of conflicting regulation.

Nor do the other subsections of section 30 of the 1940 Act pose problems of *conflicting* regulation despite the fact that they call for *more* than is required by the Interstate Commerce Act.

Section 31(c) of the 1940 Act, 54 Stat. 838 (1940), 15 U.S.C. § 80a–30 (1958) provides:

"(c) The Commission may, in the public interest or for the protection of investors, issue rules and regulations providing for *a reasonable degree of uniformity* in the accounting policies and principles to be followed by registered investment companies in maintaining their accounting records and in preparing financial statements required pursuant to this subchapter." [Emphasis added.]

Similar sections of the 1933 Act (§ 19 (a)) and of the 1934 Act (§ 13(b)) require the SEC to defer to the system of accounts prescribed by the ICC in cases where a company is regulated by both the ICC and SEC.

27. In limiting the areas of potentially conflicting regulation to those set out in text, the court has made a preliminary determination that neither the ICC's regulation of the transfer of a certificate of public convenience and necessity or a permit, nor its power to inquire into and report on management (see chart in text), presents any real potential conflict with regulation by the SEC pursuant to the 1940 Act. For example, see section 21 of the 1934 Act, 48 Stat. 899 (1934), 15 U.S.C. § 78u (1958) (from which carriers are not exempt), providing for such investigation by the SEC as it deems necessary.

Since Congress in enacting section 3(c) (9) of the 1940 Act expressly exempted from that Act a company subject to Interstate Commerce Act regulation, it would seem clear that Congress at the time did not envisage the possibility that a company regulated by the ICC might also be subject to SEC regulation under the 1940 Act. This undoubtedly explains the absence from the 1940 Act of an express provision similar to that set forth in the 1933 and 1934 Acts wherein there is explicit deference to the ICC system of accounting.

In deciding that water carriers are not exempt from SEC regulation under the 1940 Act, the court has not overlooked the possibility that a water carrier (as a result of the decision herein) may be subject to both ICC and SEC regulation in regard to accounting systems. The possibility of this administrative evil is, however, *de minimis* because the system of accounts prescribed by the ICC pursuant to section 913 of the Interstate Commerce Act would, by implication, suffice as constituting "a reasonable degree of uniformity" for the purposes of section 31(c) of the 1940 Act quoted above.

We now turn to a consideration of the second possibility (strongly emphasized by the defendants) of overlapping SEC and ICC regulation, that relating to administrative approval of certain transactions. For reasons now to be set forth herein, the court has concluded that this possibility does not present a substantial impediment to the court's conclusion that water carriers are not exempt from SEC regulation under the 1940 Act.

Section 17(a) (2) of the 1940 Act, 54 Stat. 815 (1940), 15 U.S.C. § 80a–17 (1958), makes it unlawful for an affiliated person (as defined in section 2(a) (3) of the 1940 Act):

"(2) knowingly to purchase from such registered company [with which it is affiliated], or from any company controlled by such registered company, any security or other property (except securities of which the seller is the issuer) * * *."

Subsection (b) of section 17 of the 1940 Act provides for a procedure and criterion by which the SEC may exempt transactions otherwise prohibited under subsection (a) of section 17.

Subsection (c) of section 17 of the 1940 Act makes subsection (a) inapplicable to sales or purchases of merchandise made in the ordinary course of business.

Thus, there is a potential overlapping —vis-à-vis water carriers—between the regulation by the ICC (under section 5(2) (a) (i) of the Interstate Commerce Act) and that by the SEC (under section 17 of the 1940 Act) only in the situations in which a water carrier, which is also a holding company of other carriers, merges or consolidates with, or acquires property (other than merchandise purchased in the ordinary course of business) from, its affiliated carrier (within the meaning of section 2(a) (3) of the 1940 Act); or, if such affiliated carrier merges or consolidates with, or acquires property (other than merchandise purchased in the ordinary course of business) from, another such affiliated carrier.[28]

The court agrees with defendants that, in the remote event that one of the transactions as is described above takes place, it should be subject to the approval of only one administrative agency.

Defendants, however, argue that neither agency could defer to the regulation of the other if a water carrier were not exempt under section 3(c) (9) of the

---

28. For a complete analysis of potential overlapping between section 5(2) (a) (i) of the Interstate Commerce Act and section 17 of the 1940 Act, see Hearings on S. 1181 Before a Subcommittee of the Senate Committee on Banking and Currency, 86th Cong., 1st Sess. 521–24 (1959).

The same analysis also appears in the Hearings on H.R. 2481 (the House counterpart of S. 1181) Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 86th Cong., 1st Sess. 400–04 (1959).

1940 Act and should such a transaction as is described above take place because conflicting regulation by both the ICC and SEC would be inevitable in view of the wording of the Interstate Commerce Act and the 1940 Act.

In support of the foregoing argument, defendants point to section 5(11) of the Interstate Commerce Act and section 50 of the 1940 Act as being in irreconcilable conflict. This, however, is not necessarily so.

Section 5(11) of the Interstate Commerce Act, 41 Stat. 480 (1920), as amended, 49 U.S.C. § 5(11) (1958), provides:

"The authority conferred by this section shall be *exclusive and plenary*, and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall have full power * * * to carry such transaction into effect and to own and operate any properties and exercise any control or franchises acquired through said transaction without invoking any approval under State authority; and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are *relieved from the operation of* the antitrust laws and of *all other restraints, limitations, and prohibitions of law, Federal,* State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction." [Emphasis added.]

Section 50 of the 1940 Act, 54 Stat. 846 (1940), 15 U.S.C. § 80a–49 (1958), provides:

"* * * *nor shall anything in this subchapter affect the jurisdiction of any other commission,* * * * over any person, security, or transaction, *insofar as such jurisdiction does not conflict with any provision of this subchapter* or of any rule, regulation, or order hereunder." [Emphasis added.]

At first blush, it would seem that the net effect of the foregoing provisions is to create mutual exclusivity and conflict.

If, however, an accommodation between section 5(2) (a) (i) of the Interstate Commerce Act and section 17(a) (2) of the 1940 Act could be effectuated,[29] a potential "conflict" between ICC and SEC jurisdiction would never arise. Once such jurisdictional conflict is so averted by accommodation, ICC jurisdiction would be untrammeled because section 50 of the 1940 Act states that nothing in the 1940 Act shall affect the jurisdiction of any other commission.

---

29. For example, in the 1959 proposed amendment to the 1940 Act, discussed in note 26 supra, which would have had the effect of making some carrier-investment companies subject to regulation by both the ICC and the SEC, the problem of potential conflicting regulation was resolved by the following proposed exemption provision:

"Sec. 6. (f) The following transactions shall be exempt from the provisions of this title:

"(1) Any transaction of a registered investment company which is also a carrier as defined in section 5(13) of the Interstate Commerce Act, or which, pursuant to section 5(3) of that Act, has been ordered to be considered a carrier and subject to any of the provisions therein specified, involving (i) the acquisition of control of a carrier or carriers or (ii) the issuance of securities or assumption of any obligation or liability for purposes of financing the acquisition of control of a carrier or carriers or financing of a carrier business or a business incidental thereto, provided such transaction is subject to approval by the Interstate Commerce Commission."

Hearings on H.R. 2481 Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 86th Cong., 1st Sess. 397 (1959).

It is not claimed in the case at bar that American-Hawaiian Steamship Company is affiliated (within the meaning of section 2(a) (3) of the 1940 Act) with another carrier.[30]

Therefore, it is presently unnecessary for the court to formulate an accommodating principle since the prerequisite to a conflict between section 5(2) (a) (i) of the Interstate Commerce Act and section 17 of the 1940 Act—namely, a carrier that is also a holding company of another carrier—does not exist in this case.

■ In light of the foregoing considerations, the court has reached the following conclusions as to water carriers:

1. There is no real problem of overlapping and conflicting regulation by both the ICC and the SEC in holding that water carriers are not exempt from SEC regulation under section 3(c) (9) of the 1940 Act.

2. Water carriers are not "subject to regulation under the Interstate Commerce Act" within the meaning of section 3(c) (9) of the 1940 Act and, therefore, are not exempt from the coverage of the 1940 Act.

Despite the court's decision that water carriers are subject to the regulatory provisions of the 1940 Act, the court must now resolve this remaining question: Should this decision be applied *retroactively* in the present case; that is, during the time here relevant—1955 to 1959— should the American-Hawaiian Steamship Company be held to have been subject to the provisions of the 1940 Act?

If the Company had been actively engaged as a water carrier at all of the relevant times, the court might be reluctant to apply retroactively its decision

herein that the Company is subject to the 1940 Act. See Lyons v. Westinghouse Elec. Corp., 235 F.Supp. 526, 536–537 (S.D.N.Y.1964); Note, 71 Yale L.J. 907, 944–50 (1962). To upset the justifiable expectations of parties to commercial transactions, under certain circumstances, may defeat, rather than serve, the broad purpose of the 1940 Act of protecting investors by means of the stabilization of investment companies.

However, the court is of the opinion that, in the circumstances here disclosed, this decision should be applied retroactively.

The defendant American-Hawaiian Steamship Company is not a company which, in any meaningful sense, could be deemed to have justifiably relied on section 3(c) (9) as the basis for an exemption from the 1940 Act.

■ Just as one who relies on the ambiguous language of an uninterpreted statute does so at his peril, Note, 71 Yale L.J., supra, at 947, so also does one whose status is ambiguous.

■ Once American-Hawaiian ceased its water carrier activities in 1953, it must be deemed to have been on notice that, as a dormant water carrier, it might no longer fall within the literal purview of section 3(c) (9) of the 1940 Act.[31]

■ Having concluded that the registration and other provisions of the 1940 Act were applicable to the Company during all times relevant to this case, the court will now consider the final issue: whether plaintiffs have stated a claim for relief under sections 7(a) (2) and 7(a) (4) of the 1940 Act.

It will be recalled [32] that plaintiffs claim that alleged violations of sections

---

**30.** See generally N.Y. Times, April 18, 1965, § 3 (Business), p. 3, col. 3 (pointing out American-Hawaiian Steamship Company's role within the context of defendant Ludwig's holdings).

**31.** As a matter of fact, following American-Hawaiian's cessation of shipping activities in 1953, on two separate occasions in 1953 and 1955, the SEC's staff raised the question of American-Hawai-

ian's failure to register as an investment company.

On both occasions, the Company supplied the SEC staff with an opinion of counsel to the effect that American-Hawaiian was not then an investment company subject to the Investment Company Act.

**32.** See text accompanying note 15, supra.

7(a) (2) and 7(a) (4) of the 1940 Act either themselves constituted acts of waste or placed defendants in a position of control whereby they were enabled to commit acts of waste.

It is the alleged corporate waste that is the claimed injury to the Company for which plaintiffs, derivatively, seek relief from this court.

The court holds, however, that there is no causal connection between the alleged federal violations—illegally purchasing securities and illegally engaging in business in interstate commerce—and the alleged injury claimed as the basis for damages—acts of corporate waste. The Complaint therefore fails to state a claim under sections 7(a) (2) and 7(a) (4) of the 1940 Act.

In reaching this decision, the court adopts the reasoning of Judge Goodrich in Downing v. Howard, 162 F.2d 654 (3d Cir.), cert. denied, 332 U.S. 818, 68 S.Ct. 155, 92 L.Ed. 395 (1947). See Gulf Oil Corp. v. Reed, 334 F.2d 960, 963 (D.C.Cir. 1964); Howard v. Furst, 238 F.2d 790, 794 (2d Cir. 1956), cert. denied, 353 U.S. 937, 77 S.Ct. 814, 1 L.Ed.2d 759 (1957); Meyer v. Kansas City Southern Ry., 84 F.2d 411, 414 (2d Cir.), cert. denied, 299 U.S. 607, 57 S.Ct. 233, 81 L.Ed. 448 (1936); Peterson v. Borden Co., 50 F.2d 644, 645-646 (7th Cir. 1931); Meisel v. North Jersey Trust Co., 218 F.Supp. 274 (S.D.N.Y.1963). Compare Goldstein v. Groesbeck, 142 F.2d 422, 426-427 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 36, 89 L.Ed. 590 (1944); Stella v. Kaiser, 82 F.Supp. 301, 312 (S.D.N.Y.1948).

In Downing v. Howard, Judge Goodrich outlined the claim, at 656-657 of 162 F.2d as follows:

"The provisions of the Public Utility Holding Company statute re-quired United to register with the Securities and Exchange Commission by December 1, 1935. Due to the action of the then directors, United failed to register and this failure continued until March 28, 1938. During the time in which United failed to register certain securities held by it which had a market value of $194,000,000 on December 1, 1935, depreciated to $107,-000,000 by March 28, 1938. This is the loss occasioned by United which the plaintiff says these defendants must make up."

In deciding that the above claim was not one arising under federal law, Judge Goodrich made the following observations, at 658, particularly apposite to the case at bar:

"We are unwilling to take the position urged by the defendants that the violation of the registration provisions of the statute will never bring about individual liability.[33] Violation has been held liability creating in one situation. It may or may not be in others. This case is decided on a narrower ground. When we examine the plaintiff's allegations and take his statement of facts as true we do not see how he has shown us any basis for recovery against the defendants, even conceding that a different set of facts might entitle him to recover. Section 1(b) of the Act expressly states that the interest of investors in the securities of holding companies are or may be adversely affected 'when the growth and extension of holding companies bears no relation to economy of management and operation' but plaintiff has failed to allege that the $87,000,000 loss was due to that rea-

33. This court is also "unwilling," because it is unnecessary for a determination of this case, "to take the position * * * that the violation of the registration provisions" of the 1940 Act "will never bring about individual liability." But see Willheim v. Murchison, 342 F.2d 33, 41 (2d Cir. 1965), listing

sections 15(d), 13, 15(a) (2), 15(a) (3), 10 and 18 of the 1940 Act as "this battery of protective provisions designed to 'mitigate and, so far as is feasible, to eliminate the conditions enumerated' in § 1(b)," quoted in text, supra.

son. Plaintiff correctly states that the statute provides for registration. It is also correct to say that an unregistered company was forbidden to hold shares. Suppose the company had registered. It would still have held the shares. The plaintiff does not, nor could he, allege that the shares would necessarily have been disposed of had the company registered since the statute gave no mandate to a registered company that it must divest itself of the securities. The loss to shareholders in a declining market would have been just exactly the same whether the company was registered or whether the company was not registered. Plaintiff does not allege that the loss in value in United's securities was due to failure to register. We do not see how, in the nature of things, there could be any possible connection between the mere failure to register and the decline in value in United's shares in other companies. The only possible theory on which any such responsibility could be imposed is, we think, the proposition that the statute-violator becomes an insurer against loss of every kind. This, as already pointed out, is not the law."

A paraphrase of Judge Goodrich's reasoning is that plaintiffs have failed to allege that the injury for which they seek recovery under the 1940 Act was caused by the existence of any of the evils listed in section 1(b) of the 1940 Act, quoted supra, sought to be avoided by the 1940 Act.

 Although sections 7(a) (2) and 7(a) (4) of the 1940 Act make it illegal for an unregistered investment company to purchase securities or transact business in interstate commerce, there is no allegation (nor could there be) that had the Company registered, the alleged waste would not have taken place. There is nothing in the 1940 Act which prevents a registered investment company from purchasing its own securities or transacting business in interstate commerce.

"We do not see how, in the nature of things, there could be any possible connection between the mere failure to register" and the alleged acts of waste. See Downing v. Howard, supra, at 658–659 for further discussion of the necessity of establishing a causal connection between the federal violation and the injury claimed.

Finding that no cause of action "created" by the Public Utility Holding Company Act of 1935 had been stated, Judge Goodrich affirmed dismissal of the complaint for want of federal subject matter jurisdiction.

Downing v. Howard has been criticized on the ground that, in light of Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939, 13 A.L.R.2d 383 (1946), the complaint should have been dismissed on the merits for failure to state a claim upon which relief could be granted and not for want of federal jurisdiction. Fielding v. Allen, 181 F.2d 163, 168–169 (2d Cir.), cert. denied, 340 U.S. 817, 71 S.Ct. 46, 95 L.Ed. 600 (1950); 1 Moore, Federal Practice, 631–32 & n. 52 (2d ed. 1961); Note, 56 Yale L.J. 880, 882–83 (1947). But see Howard v. Furst, 140 F.Supp. 507, 513–514 (S.D.N.Y.), aff'd, 238 F.2d 790, 793–794 (2d Cir. 1956), cert. denied, 353 U.S. 937, 77 S.Ct. 814, 1 L.Ed.2d 759 (1957), 70 Harv.L.Rev. 1493, 1496 (1957) (criticizing Howard v. Furst as a departure from Bell v. Hood).

There has been no criticism of Downing v. Howard, however, as to its analysis of the lack of causal connection between federal violation and injury.

We are dealing here with a situation exactly the same as if a cause of action were brought in a federal court under the Interstate Commerce Act, containing the following hypothetical allegations:

1. Contrary to 49 U.S.C. § 306(a) (1), defendant operated a common carrier by motor vehicle in interstate commerce on a public highway without there being in force with respect to such carrier a certificate of public convenience and necessity issued by the ICC.

2. While so operating in violation of section 306(a) (1), a motor vehicle owned and operated by defendant was negligently driven through a red light, hitting and injuring plaintiff.

Obviously, in the supposititious case, there is no causal connection between the lack of a certificate of public convenience and necessity and defendant's negligently driving through a red light. Newsome v. Dunn, 103 Ga.App. 656, 120 S.E.2d 205 (1961); see De Bord v. Proctor & Gamble Distrib. Co., 146 F.2d 54, 57 (5th Cir. 1944).

By a parity of reasoning, there is in the case at bar no causal connection between the mere failure to register and the alleged acts of corporate waste. The claims predicated on sections 7(a) (2) and 7(a) (4) of the 1940 Act cannot stand.

In granting defendants' motion for summary judgment, the court must still decide whether the various claims are to be dismissed on the merits for failure to state a claim upon which relief can be granted or for lack of federal jurisdiction over the subject matter of the action.

■ In view of the fact that this circuit has adopted the rule that dismissal of federal claims on the merits at the preliminary stages of a proceeding will also defeat any claims resting on pendent jurisdiction, O'Neill v. Maytag, 339 F.2d 764, 766 n. 3 (2d Cir. 1964); T. B. Harms Co. v. Eliscu, 339 F.2d 823, 828–829 (2d Cir. 1964), the distinction between dismissal on the merits and for lack of jurisdiction would appear to be of limited practical importance. See id. at 829 n. 3.

Nevertheless, the distinction must be made. As the court said in the O'Neill case, 339 F.2d at 766 n. 3:

"Since the result in this case is not directly required by precedents of this court or of the Supreme Court, the complaint cannot be considered frivolous, and the proper disposition was to dismiss for failure to state a claim rather than for lack of subject matter jurisdiction. Bell v. Hood, 327 U.S. 678 [66 S.Ct. 773, 90 L.Ed. 939, 13 A.L.R.2d 383] (1946)."

■ None of plaintiffs' claims can properly be denominated "frivolous" within the meaning of Bell v. Hood. This court, therefore, has jurisdiction under 28 U.S.C. § 1331 and section 27 of the 1934 Act and section 44 of the 1940 Act.

Defendants' motion for summary judgment as to all claims based on sections 10(b), 14(a) and 18(a) of the 1934 Act and sections 7(a) (2), 7(a) (4), 20(a) and 34(b) of the 1940 Act is hereby granted by dismissal of all such claims, on the merits, for failure to state a claim upon which relief can be granted.

The only claims asserted by plaintiffs which survive this motion for summary judgment are those brought under section 36 of the 1940 Act, as discussed at pages 25–27 of the Prior Decision. These claims were not challenged by defendants in this motion.

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the court makes "an express determination" that there is no just reason for delay and the court expressly directs the entry of judgment on all claims dismissed above.

In accordance with Rule 56(d) of the Federal Rules of Civil Procedure, the parties will submit an order, on five days' notice, setting out those issues of fact, relative to the claims under section 36 of the 1940 Act, that remain to be tried.